**W.E. ROBINSON, as Administrator of the Estates of W.T. Robinson and Mary H. Robinson, Plaintiff,**

v.

**UNION CARBIDE CORPORATION, Defendant.**

**and**

**W.E. ROBINSON, as Administrator of the Estates of W.T. Robinson and Mary H. Robinson, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Nos. CIV 1–84–0702, CIV 1–88–0075.**

United States District Court, E.D. Tennessee, S.D.

April 11, 1991.

George M. Derryberry, and John C. Harrison, Miller & Martin, Chattanooga, Tenn., for plaintiff.

John Wheeler, Hodges, Doughty & Carson, Knoxville, Tenn., Paul R. Leitner, Leitner, Warner, Moffitt, Williams, Dooley, Carpenter & Napolitan, Chattanooga, Tenn., and Herbert Fenster, Michael Janik, and Tami L. Azorsky, McKenna & Cuneo, Washington, D.C., for defendant, Union Carbide.

Rupert P. Mitsch, Marie Louise Hagen, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant, U.S.

## MEMORANDUM OPINION

JORDAN, District Judge.

These consolidated civil actions are before the Court for consideration of the defendants' renewed motion for summary judgment on the ground that there is no evidence that the illness and death of the plaintiff's male decedent and the illness of the plaintiff's female decedent were caused by mercury intoxication for which these defendants might be responsible. The parties have submitted to the Court a substantial volume of evidentiary material in support of and in opposition to this motion. The Court has heard the arguments of counsel.

The plaintiff alleges in his complaint [doc. 1] as amended [doc. 27][1] that his decedents, his parents, fished in the Tennessee river from Kingston, Tennessee to and including Watts Bar Lake, and that during a long period beginning in the 1950s, they ate large quantities of the fish which they caught. The plaintiff says that, unknown to his parents and to other members of the public, throughout this period, the operation of the facilities at Oak Ridge, Tennessee for the manufacture of components of nuclear weapons led to the discharge of enormous quantities, measured in the hundreds of thousands and perhaps even millions of pounds, of mercury into waterways near Oak Ridge. The plaintiff says that this mercury found its way to the waters in which his parents fished, that it contaminated the fish which they caught, and that they ingested unsafe amounts of mercury or methylmercury chronically, given the large amount of fish in their diet. This, the plaintiff says, caused them to suffer from mercury intoxication, and caused his father to die.

The plaintiff sues the United States as the entity responsible ultimately for the operations at Oak Ridge. Union Carbide Corporation was the contractor which operated the facilities at Oak Ridge for the government from their beginning to April, 1974.

---

1. References to document numbers are to documents as filed in No. CIV 1–84–0702.

The Court denied an earlier motion for summary judgment on the same ground, in 1989 [doc. 66]. The defendants renewed their motion in August, 1990 [doc. 127], and have continued to the present to submit material in support of it and in response to arguments made by the plaintiff. The gist of the defendants' argument is that the plaintiff's parents suffered from Alzheimer's disease, not from mercury intoxication. The expert evidence in support of the defendants' argument is very strong, and may be summarized as follows. Dr. William O. Whetsell, Jr., who is a professor of pathology and psychiatry, and the director of neuropathology, at the Vanderbilt University School of Medicine, says in his affidavit that a physician may make a definitive diagnosis of Alzheimer's disease only upon an analysis of postmortem brain tissue. Dr. Whetsell examined brain tissue samples taken from the cadaver of W.T. Robinson, the plaintiff's father, and says that his findings from this analysis "provide the basis for the definitive diagnosis of Alzheimer's disease." Dr. Whetsell notes in his affidavit that his postmortem diagnosis is consistent with diagnoses made while Mr. Robinson was still alive, and which are found in his medical records. Dr. Whetsell also notes that Mr. Robinson's brain tissue did not show the characteristic pathologic changes which are "almost always" left by methylmercury intoxication, and that there is nothing in the clinical evidence in Mr. Robinson's medical history which is specifically a symptom or sign of methylmercury intoxication. "No medical authorities have concluded that mercury causes Alzheimer's disease," according to Dr. Whetsell.

When Dr. Whetsell made his affidavit, in May, 1989, the plaintiff's mother, Mary H. Robinson, was still alive. Dr. Whetsell noted that her medical records which he reviewed also included one or more diagnoses of Alzheimer's disease, and that tests of her urine in 1983 and 1985 showed normal levels of mercury, lead, and arsenic. Dr. Whetsell concluded at that time that Mary H. Robinson suffered from a dementing illness which might be caused by Alzheimer's disease.

Dr. Whetsell supplemented his affidavit after Mary H. Robinson died, to state his findings from his analysis of her postmortem brain tissue. He concluded that she had suffered from Alzheimer's disease, and that there was no evidence that methylmercury played any role in her health problems.

The defendants presented another expert opinion in the form of an affidavit made by Dr. N. Karle Mottet, a professor of pathology and environmental health at the University of Washington School of Medicine in Seattle, Washington. Dr. Mottet, like Dr. Whetsell, concluded that there was no clinical evidence in either decedent's medical history of symptoms or signs of methylmercury intoxication. Dr. Mottet reports that his analysis of postmortem brain tissue from Mr. Robinson showed none of the "telltale signs" which are "almost always" left by methylmercury intoxication, but that his analysis did show "definite landmarks of Alzheimer's disease." Dr. Mottet refers in his affidavit to records of assays for the purpose of determining the amount of mercury in Mr. Robinson's postmortem tissue to support his conclusion that mercury in Mr. Robinson's body was within normal limits.

Dr. Mottet, like Dr. Whetsell, supplemented his affidavit after Mary H. Robinson's death [doc. 130], to report that his review of laboratory reports concerning tissue taken from her, as well as his analysis of postmortem brain tissue taken from her provided "convincing" evidence that she suffered from Alzheimer's disease, and no evidence that she suffered any adverse health effects from exposure to methylmercury.

The plaintiff, in responding to the evidence submitted by the defendants, first referred to the material which he had submitted previously in response to the defendants' first motion for summary judgment [doc. 52A]. This material includes the affidavit of Gerald L. Vaughan, Ph.D., a professor of zoology and the director of the graduate program in physiology at the University of Tennessee. Dr. Vaughan concludes in his affidavit that Mr. Robinson

ingested much more than the allowable daily intake ("ADI") of mercury during the long period that he was fishing in the Tennessee River and Watts Bar Lake. However, Dr. Vaughan bases his opinion upon several assumptions, which he states in his affidavit. Dr. Vaughan's information concerning the amount of fish in Mr. Robinson's diet is based entirely upon what the plaintiff told him. Dr. Vaughan assumes that much of the mercury measured by Tennessee Valley Authority ("TVA") in a nearby waterway or waterways was methylmercury, and that the amount of mercury in this waterway or waterways was much higher when Mr. Robinson was fishing than when it was measured in 1984 and 1985.

Dr. Vaughan also states in his affidavit, based upon his review of laboratory reports, that "[t]here can be little doubt that the symptoms exhibited by Mr. William T. Robinson prior to his death could have been caused by ingestion of mercury in fish taken from the upper Watts Bar Lake/Clinch River system." Even assuming the competence of a zoologist who is not a physician to express an opinion concerning the cause of symptoms of illness or disease exhibited by a human being, the opinion that certain symptoms could have been caused by methylmercury intoxication is speculative at best.

The plaintiff submitted also an affidavit made by Dr. Thomas Lee Kurt, the associate medical director of the North Texas Poison Center at Parkland Memorial Hospital in Dallas. Dr. Kurt is a toxicologist as well as a physician. Dr. Kurt assumes for the purpose of rendering his opinion that Mr. Robinson consumed over a period of years large quantities of fish caught in a body of water "which ha[d] received discharges of mercury from" the facilities at Oak Ridge. Considering this assumption together with the autopsy report and analysis of Mr. Robinson's postmortem brain tissue, Dr. Kurt concludes, "based upon a reasonable medical certainty, ... methyl mercury poisoning caused or contributed to the chronic disability and demise of William Robinson and to the chronic disability of Mary Robinson."

Dr. Kurt says that Dr. Whetsell and Dr. Mottet came to the opposite conclusion because they did not take into account the facts that the Robinsons would have metabolized mercury over time, that their chronic ingestion of mercury ceased when they were admitted to nursing homes, and that some methylmercury is lost from tissue in storage, at least if the storage is in formaldehyde or another organic chemical. Their failure to take these factors into account, according to Dr. Kurt, caused Dr. Whetsell and Dr. Mottet to understate the amounts of mercury which probably were in Mr. and Mr. Robinson's bodies. Dr. Kurt adds that his conclusion is bolstered by the unusual fact that both husband and wife suffered a similar debilitating brain disease in this case.

The autopsy report concerning Mr. Robinson upon which the plaintiff's experts rely was made by Dr. Robert L. Kendall of Murfreesboro, Tennessee. Unlike Dr. Whetsell and Dr. Mottet, in his microscopic examination of Mr. Robinson's postmortem brain tissue, Dr. Kendall noted an absence of the senile plaques and neurofibrillary changes typical of Alzheimer's disease. Dr. Kendall concluded that mercury intoxication "is the probable cause of the clinical behavioral changes with early senility that developed in this patient and may well as (sic) be the cause of similar symptoms now in his wife."

However, in his report, Dr. Kendall noted that he was not an expert concerning mercury intoxication, and that, in order to determine normal levels of mercury in human tissues, he had to consult an article in volume 29 of Archives of Environmental Health authored by Dr. R.L. Body and Dr. Mottet, the defendants' expert. Using the figures from this article as he interpreted in them, Dr. Kendall concluded that the amount of mercury in Mr. Robinson's brain tissue was 12.5 times the normal amount. Dr. Kendall stated in his deposition given before his untimely death that if his conclusion that Mr. Robinson's brain tissue contained 12.5 times the normal amount of mercury was based upon an incorrect reading or understanding of the article by Dr.

Mottet and Dr. Body, his conclusion was incorrect. "If that number is incorrect, we don't know any more than we did before." The amount of mercury in Mr. Robinson's brain tissue reported by Dr. Kendall, 1.0 ug/g, is within the range of 0.1 to 1.8 ug/g reported by Dr. Mottet and Dr. Body as the range of background levels established by autopsies of persons with no known exposure to mercury.

In order to attempt to attempt to establish a genuine issue concerning whether fish eaten by his parents were contaminated with mercury discharged into waterways from the facilities at Oak Ridge, the plaintiff submitted portions of a report and a report summary prepared by the Mercury Task Force of Union Carbide Corporation's Nuclear Division ("UCC–ND"), and of a report prepared by the Office of the Inspector General of the United States Department of Energy ("DOE") concerning an alleged coverup of data concerning mercury contamination at the site of the Oak Ridge facilities. However, this evidence, even when read in a light most favorable to the plaintiff, has nothing to say concerning mercury in fish caught anywhere other than in the East Fork of Poplar Creek, some distance from the sites where the plaintiff says his parents fished.[2] There is some evidence in this documentary material that much of the mercury which found its way into the Tennessee River system past Kingston was trapped in the sediment at the bottom of Watts Bar Lake, particularly during the period 1955 through 1960. However, one sentence in the document entitled *Mercury at the Y–12 Plant/A Summary of the 1983 UCC–ND Task Force Study* [doc. 52A, tab 6] highlights the plaintiff's problem in establishing causation in this case: "It is of interest, of course, to speculate on how much mercury is in Watts Bar lake." While the scientific process begins frequently with speculation, juries in tort cases are not permitted this intellectual pleasure.

The plaintiff supplemented [doc. 149] his evidentiary material in opposition to the defendants' motion for summary judgment by submitting, among other things, portions of the transcript of the discovery deposition of Dr. Kurt. Dr. Kurt did not alter his conclusion as stated in his affidavit. He identified his sources of information concerning the amount of fish which the plaintiff's parents ate as the plaintiff, some eyewitnesses who have been produced by the plaintiff for videotaped depositions, and a history taken of the plaintiff's parents by a physician named Dr. Littell.

However, Dr. Littell's history does not provide any clinical evidence of mercury intoxication. In the plaintiff's mother's medical records [doc. 155, appendix tab 9], L.F. Littell, M.D. notes in a history of Mrs. Robinson recorded on or after a March 28, 1985 admission, "Mrs. Robinson and her husband spent many summers at Watts Bar Lake fishing and eating a lot of fish. Mercury poisoning was suspected to be cause of husbands (sic) earlier senile mental changes and possibly her mental problems." This clinically unsubstantiated history is contradicted by Dr. Littell's impressions upon examination of Mrs. Robinson: "generalized arteriosclerosis with organic brain syndrome; Parkinsonism."

Dr. Kurt repeated his assertion that Dr. Whetsell and Dr. Mottet were relying upon values for the amounts of mercury in the plaintiff's parents' brains which were too low, and noted that a test for measuring mercury in human tissues other than the test used by the laboratory in this case had been shown to produce routinely higher values. Dr. Kurt did concede, however, that there was clinical evidence that Alzheimer's disease was "coexistent" with mercury intoxication in the plaintiff's parents, stating that some changes associated

---

**2.** As the map included with excerpts from the transcript of the plaintiff's deposition [doc. 52A, tab 1], the one included with a TVA Office of Natural Resources and Economic Development report [doc. 155, appendix, tab 18], and the one in a summary of a UCC–ND Mercury Task Force report [doc. 52A, tab 6] show, the East Fork of Poplar Creek flows into the Clinch River, which meets the Emory River above Kingston. The Clinch River flows into the Tennessee River at Kingston; Watts Bar Lake is downstream from this point.

with Alzheimer's disease are "nearly ubiquitous" in human beings past the age of 70.

Dr. Vaughan, in a supplemental affidavit, identifies the source material upon which he based his assumption that the average mercury content in the fish caught and eaten by the plaintiff's parents was 0.33 mg/kg, or parts per million ("ppm"). Dr. Vaughan states in his supplemental affidavit [doc. 149, ex. B],

> That assumed average mercury level, which should be used both for Mr. and Mrs. Robinson, was obtained from a report entitled "Preliminary Review of TVA Fish Sampling and Analysis Report," which was the report of "Task Group Five," written by Travis, Hoffman, Blaylock, Daniels, Gist and Weber. Table 1 of that report gives a mean mercury level of contamination in fish samples of 0.33 mg/kg. I also considered a document entitled ORNL–6209, published by Martin Marietta Energy Systems in August, 1985. In table 30 on page 44 of this report, values for bass and bluegill at Clinch River mile 12 were 0.31 and 0.35 mg/kg, respectively. The average of these two values equals the mean level set forth in the "Task Group Five" report.

The sources upon which Dr. Vaughan relies will be discussed below in this Memorandum Opinion.

The plaintiff also submitted, in his supplemental response to the motion for summary judgment, portions of the transcripts of the depositions taken of the two eyewitnesses referred to by Dr. Kurt who testified regarding the plaintiff's parents' fishing and eating habits. One witness, Vinita Fritts, testified that she saw the plaintiff's parents fish during the morning and the afternoon, and that she saw the plaintiff's mother prepare large quantities of fried bluegill for meals. [Doc. 149, ex. C.] This falls far short of establishing what quantities of fish these individuals ate regularly over an extended period of time. Another witness, Tressie Crank, testified that the plaintiff's parents were "lovers of fishing," that they fished on Watts Bar Lake where they might catch 100 fish a day, and that she had seen them eating from a platter of fish at their home. This witness indicated that the plaintiff's parents froze much of their catch to eat later. She described them as very heavy eaters.

Earlier, in response to the defendants' initial motion for summary judgment, the plaintiff stated in an affidavit [doc. 52A, tab 1] his estimates, in pounds, of the amounts of fish consumed by his parents during the period from 1955 through 1979. However, as is pointed out by the defendants, in his deposition [*see* doc. 129, tab B], William Eugene Robinson testified, "Oh, I didn't eat much fish with them. I mean, I didn't eat that many times with them...."

In his supplemental response to the motion for summary judgment under consideration, the plaintiff also submitted an excerpt from the transcript of the deposition of Jerry Elwood, Ph.D., a research and environmental scientist employed by Union Carbide Corporation who reported in 1977 that mercury levels in fish caught in the East Fork of Poplar Creek exceeded the level treated as permissible by the United States Food and Drug Administration ("FDA"). While there is some evidence that Union Carbide Corporation suppressed Dr. Elwood's report, at least for some time, the fact remains that Dr. Elwood had nothing to say in any of the deposition excerpts submitted by the plaintiff concerning the level of mercury, if any, found in fish in the waterways fished by Mr. and Mrs. Robinson.

The last expert witness submitted by the plaintiff by way of affidavit is Dr. Serge Duckett, a professor of neuropathology at the Jefferson Medical College of Thomas Jefferson University in Philadelphia. Dr. Duckett reviewed tissue blocks, slides, and other materials regarding postmortem studies of the brains of the plaintiff's parents, as well as slides and samples prepared by Dr. Kendall during the autopsy of the plaintiff's father. Dr. Duckett also read the plaintiff's parents' medical records, the plaintiff's affidavit regarding his parents' fishing and eating habits, and the affidavits of Dr. Whetsell, Dr. Mottet, Dr.

Kurt and Dr. Vaughan. Dr. Duckett says in his initial affidavit, "I was told that from 100 to 200 tons of mercury were released from the Y-12 weapons plant at Oak Ridge, Tennessee, which found their way by stream flow into Watts Bar Reservoir, in which Mr. and Mrs. Robinson are reported to have fished."

Dr. Duckett's initial conclusion is inconclusive:

The non-specific and generalized nature of the neuropathological changes evident in Mr. and Mrs. Robinson's brain tissue dictates that further attention be given to their medical history, to the history of their exposure to methyl mercury, and to clinical observations. In this regard, a demonstrated history of chronic and unusually high consumption of fish caught from waters known to be polluted by large amounts of mercury, and the presence of such clinical and historical observations as dementia, tremor, rigidity, loss of peripheral vision and sense of smell, and other conditions that have been associated with cases involving exposure to methyl mercury, would strongly suggest that such exposure played a causative role in the case of Mr. and Mrs. Robinson.

[Doc. 152.]

On April 5, 1991, the plaintiff submitted a supplemental affidavit from Dr. Duckett, in which he states simply,

I expect to complete all analytical or laboratory work in connection with this case on or about April 11, 1991. Nevertheless, at this point, based upon the background and materials referred to in my earlier affidavit, my further examination of their tissue samples, and my knowledge of the available studies and information concerning not only Alzheimer's Disease, but also acute and chronic methyl mercury poisoning, it is my opinion, to a reasonable degree of medical certainty, that methyl mercury was a substantial contributing factor to the pathology and symptoms exhibited by Mr. and Mrs. Robinson.

Another item of evidence submitted by the plaintiff on April 5 is an August, 1986 report entitled *A Report to the Environmental Advisory Committee on Mercury and Other Pollutants: Effects on Workers, General Population, and Oak Ridge Population.* This report was written by David O. Marsh, M.D., a professor neurology at the University of Rochester, who served as a member of the Oak Ridge Environmental Advisory Committee apparently formed by Union Carbide Corporation. However, the plaintiff's reliance upon this report like his reliance upon the 1983 report made by the UCC-ND Mercury Task Force, depends upon a reading of it which might be characterized as generous. Dr. Marsh quotes a 1984 study conducted by the Tennessee Department of Health and Environmental in collaboration with the Centers for Disease Control which "concluded that 'residents and workers of Oak Ridge, Tennessee are not likely to be at increased risk for having significantly high mercury levels. Urinary and hair mercury concentrations were below levels associated with known health effect.'" Dr. Marsh also stated in his report:

Mercury concentrations in [East Fork of Poplar Creek] fish continue to be elevated, and warnings against consuming fish from this source should persist. These should be directed especially to women of childbearing age, since the fetus is especially susceptible to adverse effects of methylmercury, and a program of hair sampling for mercury analysis should be considered for this subgroup of the population. Maximum discharge of mercury into East Fork Poplar Creek occurred in 1956 to 1958, and mercury was transported downstream as far as Watts Bar Dam. Data are lacking concerning fish mercury concentrations and fish consumption during those years of peak contamination, but maximum fish mercury levels must have been greater than three parts per million.... The possibility cannot be excluded that individuals may have consumed quantities of fish caught between East Fork Poplar Creek and Watts Bar Dam that could have resulted in adverse health effects. *Without adequate data concerning fish methylmercury concentration for fish consump-*

*tion during the 1950s, it is not possible to ascertain the risk that may have existed.*

(Emphasis added.)

On April 8, 1991, the defendants, in response to this additional evidence submitted by the plaintiff, provided a copy of excerpts from the transcript of Dr. Marsh's deposition taken in these civil actions. Dr. Marsh testified that his statement that maximum fish mercury levels must have been greater than three parts per million referred only to fish in the East Fork of Poplar Creek, a limitation which he did not specify in his 1986 report because it was understood by the knowledgeable audience to which his report was addressed, the other members of the Environmental Advisory Committee.

Whether or not there is a genuine issue in this case concerning the cause or causes of the plaintiff's parents' illnesses and the plaintiff's father's death, the problem which the plaintiff has encountered in marshaling his evidence in opposition to the defendants' motion for summary judgment is to trace the mercury from the discharges at the Oak Ridge facilities to the waters in which his parents fished, and into the fish which Mr. and Mrs. Robinson consumed. As is stated above, the plaintiff relies to a great extent upon Dr. Vaughan, the zoologist, to accomplish this. However, as the excerpts from the transcript of Dr. Vaughan's deposition submitted by the defendants [doc. 155, appendix tab 16] show, there are serious gaps in Dr. Vaughan's construction of how mercury went from the facilities at Oak Ridge into the plaintiff's parents' bodies. Dr. Vaughan conceded that the validity of his opinion stated in his affidavit depends upon the validity of his assumption that the average mercury level in fish eaten by the Robinsons was 0.33 mg/kg. Yet the reports to which Dr. Vaughan referred either do not support such an assumption with respect to fish taken specifically from the areas where the Robinsons are alleged to have fished, or, where there are figures for samples taken from an area where the Robinsons might have fished, they do not rise to the level of Dr. Vaughan's assumption.

The latter is the case with respect to samples of fish taken from Watts Bar included in a TVA report entitled *Mercury Concentrations in Fish Flesh/May, 1970–May, 1972/Survey of TVA Reservoirs* [doc. 129, ex. C]. Another TVA document, *Preliminary Review of TVA Fish Sampling and Analysis Report/Report of Task Group Five* [doc. 155, appendix tab 17], states only that the fish samples were collected at various sites along the Clinch River. This is true also of a document prepared for DOE by TVA's Office of Natural Resources and Economic Development, *Fish Sampling and Analysis/Task 4/Instream Contaminant Study* [doc. 155, appendix tab 18], and a report prepared by Martin Marietta Energy Systems, Inc., *Environmental Monitoring Report/United States Department of Energy/Oak Ridge Facilities/Calendar Year 1984*, ORNL–6209 [doc. 155, appendix, tab 19].

Dr. Vaughan admits in his deposition that he is not certain of the migratory habits of bluegill or sunfish, although he does know "that largemouth bass do move significant distances." Therefore, there is no scientific evidence in this record on the basis of which the Court would be justified in assuming that data concerning the levels of mercury in fish caught upstream apply equally to fish caught downstream where the Robinsons are alleged to have fished. There is also nothing in the record to establish that mercury levels found in fish caught upstream, or measured in the water or sediment upstream may be used scientifically to form an assumption concerning the mercury content level in fish downstream where the Robinsons are alleged to have fished. Dr. Vaughan testified as follows:

Q. Have you made the assumption that if you took fish from [the East Fork of Poplar Creek] and analyzed the flesh of those fish for Mercury content that it would give you a fair value to use for calculating Mr. Robinson and Mrs. Robinson's Mercury intake from eating fish?

A. It's basically the only value that I have to calculate with since I don't have values from further down in the Watts Bar reservoir. Incidentally, the point of mentioning this 25 or 30 times increase in Mercury in the Poplar Creek system is that the clearance of Mercury from the system is pretty instantaneous. It's in the water, then it's in the Clinch River. And there was an indication that earlier on that level of Mercury in that system was much higher. And one can only conclude that the level of Mercury entering the Clinch River was also much higher. So, in fact, over much of the period when Mr. Robinson was eating those fish, fish for whom I have no Mercury values, I must assume that they must have been higher than they are at this current time.

Dr. Vaughan seems to have made a leap of faith to the conclusion that mercury levels in fish eaten by the Robinsons were higher when they caught the fish, without first having established how data collected from the East Fork of Poplar Creek and elsewhere in the Clinch River system might help to determine mercury levels in the Tennessee River or in Watts Bar Lake, or in fish caught in those waterways. As is stated above in this Memorandum Opinion, one TVA study concerning the amount of mercury in Watts Bar Lake indicated that the amount could only be the subject of speculation without further study. Neither Dr. Vaughan nor any of the sources to which he refers evidences this further study.

The plaintiff relies heavily upon a report published by UCC–ND entitled *Mercury at Y–12/A Study of Mercury Use at the Y–12 Plant, Accountability, and Impacts on Y–12 Workers and the Environment—1950 to 1983*, doc. Y/EX–24 [doc. 149, ex. E]. However, once it is understood that there is a significant distance between the East Fork of Poplar Creek and the locations where the plaintiff's parents are alleged to have fished, a fact which is not controvert-

ed and which is established by maps in the record before the Court,[3] the conclusion reached by UCC–ND's 1983 Mercury Task Force works against the plaintiff: "In this study, the only target population thought to be in any way at risk is persons who continuously eat East Fork Poplar Creek fish, which in some cases concentrate mercury two levels higher than that recommended by the FDA (1.0 ppm at present stream levels)."

There is little dispute in this case about the applicable law, as opposed to the results reached after the application of that law to the facts in the record. Fed.R.Civ.P. 56 requires this Court, once a motion for summary judgment has been made and supported as provided in the Rule, to grant the motion unless the opponent of it shows, by affidavits or in some other evidentiary manner, the existence of a genuine issue for trial. "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

■ "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted). The rule requires the trial judge not to weigh the evidence, but to determine whether a fair-minded jury could find for the opponent of the motion on the basis of the evidence submitted in support of and in opposition to the motion. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.,* at 252, 106 S.Ct. at 2512.

---

**3.** *See* footnote 2, *supra.*

■ It is true that the trial judge, in considering a motion for summary judgment, must treat the evidence submitted by the opponent of the motion as credible, and must draw all justifiable inferences in the opponent's favor. *Anderson v. Liberty Lobby, Inc., supra,* at 255, 106 S.Ct. at 2513 (citation omitted). This does not mean that the opponent of the motion can survive it merely by restating his conclusory allegations in affidavit form, or by presuming the existence of material facts.

> That converts the operation of Rule 56 to a circular promenade: plaintiff's complaint makes general allegation of injury; defendant contests through Rule 56 existence of specific facts to support injury; plaintiff responds with affidavit containing general allegation of injury, which must be deemed to constitute averment of requisite specific facts since otherwise allegation of injury would be unsupported (which is precisely what defendant claims it is).

*Lujan v. National Wildlife Federation,* 497 U.S. 871, 881, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990).

■ There cannot be any dispute in this case that Tennessee law governs the plaintiff's claims against Union Carbide Corporation in his diversity action against that defendant. 28 U.S.C. § 1652. The plaintiff is a resident of Tennessee, his parents resided here, the alleged contamination of waterways and aquatic wildlife took place entirely within Tennessee, at least for the purposes of this litigation, and Mr. and Mrs. Robinson caught and ate the fish which allegedly contained dangerous amounts of mercury in Tennessee. Tennessee substantive law likewise governs the plaintiff's Federal Tort Claims Act lawsuit against the United States. 28 U.S.C. § 2674; *Frazier v. United States,* 412 F.2d 22, 23 (6th Cir.1969) (citation omitted).

■ Under Tennessee law, "proof of an essential fact may be made by circumstantial evidence, but a verdict of the jury cannot be based on speculation, surmise, or conjecture. Likewise, it is not permissible to rest a decision upon a remote inference." *Hayes v. Gill,* 216 Tenn. 39, 45, 390 S.W.2d 213, 216 (1965). An expert opinion that x was possibly the cause of y is mere speculation, not evidence, and is therefore inadmissible, and cannot be a basis for a finding of fact. *Lindsey v. Miami Development Corporation,* 689 S.W.2d 856, 861–62 (Tenn.1985). *See also Sterling v. Velsicol Chemical Corporation,* 855 F.2d 1188, 1200–1201 (6th Cir.1988) (applying Tennessee law) ("Medical testimony that ingesting the contaminated water 'possibly,' 'might have,' or 'could have' caused the plaintiffs' presently ascertainable or anticipated injuries does not constitute the same level of proof as a conclusion by a reasonable medical certainty.")

■ Under the Federal Rules of Evidence, this Court has an obligation to determine, before admitting expert testimony, whether the expert's opinion rests upon a foundation so unreliable that it should be excluded from consideration. *See generally Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 422 (5th Cir.1987) (citations omitted). "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible...." *Id.*

■ Furthermore, even when an expert's affidavit is admissible, it will not serve automatically to defeat a motion for summary judgment, if it is so "minimal" that it could not by itself establish a necessary element of the plaintiff's case, and if there has been an adequate opportunity for discovery. In such a case, the proper course for the trial court is not to strike the affidavit, but instead to grant the summary judgment motion if there is no other evidence of a genuine issue of material fact. *See generally Monks v. General Electric Company,* 919 F.2d 1189 (6th Cir.1990).

■ Applying this law to the record before it, the Court cannot deny the defendants' renewed motion for summary judgment on the basis of the affidavits and other material submitted by the plaintiff, because a finding for the plaintiff by a lay jury on the evidence in this record would require giving the plaintiff the benefit of

unsupported presumptions concerning factual elements material to the plaintiff's case, and drawing remote inferences without the bases provided by necessary scientific evidence. The autopsy report by Dr. Kendall is unreliable because of the established misunderstanding by Dr. Kendall of Dr. Mottet's data used in determining normal or background levels of mercury in human tissues. Even though he based his opinion in part upon the autopsy report, Dr. Kurt's opinion might still be held to show the existence of a genuine issue concerning causation, but only if his assumption that Mr. and Mrs. Robinson consumed over a period of years large quantities of fish contaminated by mercury. Thus the plaintiff's case depends upon the evidence in the record of the plaintiff's parents' fishing and eating habits, and upon the evidence supplied by the zoologist, Dr. Vaughan.

The former is clearly inadequate. The only such evidence in the record comes from three witnesses, two of whom saw Mr. and Mrs. Robinson fish and eat on a few occasions. This falls far short of showing, even if it is assumed their fish were contaminated, the chronic ingestion which would cause mercury intoxication. As for the testimony of the plaintiff, the Court cannot allow his measurements in pounds of his parents' fish consumption to be taken as evidence of this after his admission during his deposition that he did not have meals with them often. Any evidence of their consumption of fish must be based upon personal knowledge. *See* Fed. R.Evid. 602.

The fundamental shortcoming of the plaintiff's case, however, is that which is most apparent in the affidavit and deposition testimony of Dr. Vaughan. It is apparent that proof of causation in fact in this case requires at a minimum evidence that mercury from the facilities at Oak Ridge found its way, in dangerous levels, into fish in the areas where the Robinsons fished, either because fish already contaminated migrated into these areas, or because the mercury itself came into the waterways and entered into the food chain including the fish caught and eaten by the Robinsons. It is also apparent that such evidence must come from an expert source or sources; neither the migratory habits of certain species of fish nor the manner in which mercury travels in waterways with or without dilution is within the knowledge of lay people.

This is precisely the kind of evidence, however, which Dr. Vaughan assumes in rendering his opinion. In spite of his attempted explanation, there is nothing in this record to support his assumption that fish flesh in the areas where Mr. and Mrs. Robinson fished contained an average mercury content of 0.33 ppm during the relevant time period. If anything, the UCC–ND and TVA documents upon which he relies support an opposite conclusion, that no danger of mercury intoxication exists save to children born to mothers who consumed large quantities of fish caught in a waterway some distance upstream from where the plaintiff says his parents fished. The plaintiff has now had over six years in which to collect probative data which might dispel the speculation about the mercury contamination of aquatic wildlife in the Watts Bar Lake region, but has failed to do so.

The Court is left, then, with Dr. Duckett's testimony. Dr. Duckett can only say that Mr. and Mrs. Robinson suffered from mercury intoxication; he cannot identify the source of any such intoxication. Furthermore, his supplemental affidavit, the only one in which he expresses an opinion which is more than merely speculative, states simply that he has studied, that he has reached a conclusion, and what that conclusion is. "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Viterbo v. Dow Chemical Co., supra,* 826 F.2d at 424.

For the reasons stated, the Court will grant the defendants' renewed motion for summary judgment, and dismiss these civil actions.