James COWAN, et. al.

v.

TREETOP ENTERPRISES, INC. et al.,

No. 3:98–0623.

United States District Court,
M.D. Tennessee.
Nashville Division.

Aug. 27, 1999.

Trevor Wayne Howell, R. Scott Jackson, Jr., Howell & Jackson, PLLC, Nashville, TN, for plaintiffs.

Hugh C. Howser, Jr., Charles Eric Stevens, Kara E. Shea, Miller & Martin, LLP, Nashville, TN, for defendants.

### MEMORANDUM

HIGGINS, District Judge.

The plaintiffs, James Cowan, Andrew McMahan, Timothy Harper and Patricia Morton, filed this action under the Fair Labor Standards Act, 29 U.S.C. § 216(b), on behalf of themselves and all others similarly situated,[1] against the defendants: Treetop Enterprises, Inc., their current or former employer; and James L. Shaub, II, and William (Billy) E. Ezell, III, officers and stockholders of Treetop.[2] In essence, the plaintiffs allege that as current or former unit managers at Treetop's restaurants, the defendants have deemed them *bona fide* executive employees who are exempt from FLSA's overtime pay requirements. The plaintiffs assert that in actuality, the primary duty of the unit manager is being a grill operator or cook on the first shift and that in fact, unit managers are regular employees and entitled to overtime for the substantial number of hours worked each week beyond FLSA's 40–hour limit without overtime compensation.

Pending before the Court are the following motions filed January 11, 1999:(1) the plaintiffs' motion for partial summary judgment (Docket Entry No. 168); (2) the defendants' motion for summary judgment (Docket Entry No. 174); and (3) the defendant Treetop's motion for oral argument (Docket Entry No. 178); as well as the plaintiffs' motion (filed February 1, 1999; Docket Entry No. 180) to strike the defendants' expert report and the defendants' motion (filed March 12, 1999; Docket Entry No. 201) to supplement the record.

For the reasons stated below, the plaintiffs' motion to strike shall be granted.

---

1. After issuance of a court-approved notice, 123 additional former and current employees of the defendant Treetop opted into this action and each filed a consent to become a party plaintiff.

2. Mr. Ezell is chairman of the board of directors and CEO of Treetop and owns approximately 83 percent of the stock. Mr. Shaub, II, is the COO of Treetop and owns approximately 1½ to 2 percent of the company's stock. Defendants' memorandum (Docket Entry No. 176) in support of their motion for summary judgment at 9.

The defendants' motion to supplement the record shall granted. The defendant Treetop's motion for oral argument shall be denied as moot. The plaintiffs' motion for partial summary judgment and the defendants' motion for summary judgment shall be granted in part and denied in part.

## I.

Under a franchise agreement with Waffle House, Inc., Treetop owns and operates 103 Waffle House restaurants, some of which are in Tennessee, Alabama, Mississippi and Kentucky. Each restaurant unit is a separate facility of 1,750 square feet and seats approximately 33 to 46 customers. Plaintiffs' response (filed February 1, 1999; Docket Entry No. 184) to defendants' statement of undisputed facts, ¶¶ 6–8. The restaurants have three shifts: 7:00 a.m. to 2:00 p.m., 2:00 p.m. to 9:00 p.m. and 9:00 p.m. to 7:00 a.m.; but the first shift is the busiest and most profitable and yields 50 percent of all sales in the restaurants. Affidavit of William E. Ezell, III (filed January 11, 1999; Docket Entry No. 175) ¶ 12.[3]

Under its organizational structure, Treetop assigns a unit manager to each restaurant. Each unit manager is supported by a district relief manager who substitutes for the unit manager on the unit manager's days off. *Id.,* ¶ 10. The parties agree that the duties and responsibilities of unit managers and district relief managers are identical. Plaintiffs' response (Docket Entry No. 184) ¶ 9. The unit managers report directly to a district manager who usually has responsibility for three restaurant units in a defined geographical area. Treetop currently has 30 district managers who supervise unit managers and workers in the restaurants. Ezell affidavit (Docket Entry No. 175) ¶ 10.

A district manager reports to a division manager who has responsibility for nine restaurants generally in three districts. Treetop currently has twelve division managers. Plaintiffs' response (Docket Entry No. 184) ¶ 13, 14. A division manager, in turn, reports to a regional manager, who generally has responsibility for 25 to 30 restaurants in a defined geographical area. Plaintiffs' response (Docket Entry No. 184) ¶ 15. However, currently Treetop has only one regional manager who is responsible for 15 restaurants, and the remaining restaurants do not have regional managers. Plaintiffs' notice (Docket Entry No. 173), James Shaub deposition at 82–83; plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 54. The regional managers report to area managers who report directly to the president and chief operating officer of Treetop. Plaintiffs' response (Docket Entry No. 184) ¶ 16.

At some point in their employment with Treetop, the plaintiffs have worked or are currently working as unit managers and/or district relief managers. *Id.,* ¶ 3. Treetop has classified its unit managers and district relief managers as exempt "executives" under the FLSA. Plaintiffs' response (Docket Entry No. 184) ¶ 2. Each restaurant is staffed by 15 to 20 hourly employees who generally serve in two distinct categories, grill operators ("cooks") and sales persons ("waitresses"). *Id.,* ¶ 18.

In theory, Treetop considers its unit managers to be responsible for "organizing all resources necessary in servicing the customer and seeing that service actually happens as contemplated. The key ingredient to service is personnel." Ezell affidavit (Docket Entry No. 175) ¶ 24. The unit manager's job description in *Waffle House Way,* an operational manual prepared and distributed to franchises by Waffle House, reflects that the unit manager's job includes staffing as does the

---

**3.** Treetop's objective is for each Waffle House restaurant to be standardized because "the customer[s] appreciate[] the predictability of consistency in the restaurants, the fact they know if they eat at one of our restaurants in Tennessee they should expect the same quality of food, service, cleanliness, and attention to detail when eating at one of our restaurants in Alabama, Kentucky, or Mississippi." *Id.,* ¶ 23.

district manager's job. Plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 99. Yet in practice, staffing is the district manager's job. The three main components of the position of district manager is sales, profit and people. Providing proper staffing plays a major role in sales and profit. Plaintiffs' notice (Docket Entry No. 173), Donnie Bean deposition at 144–150.

As to their individual restaurant activities, because the first shift is the busiest, the unit manager is usually the grill operator or cook for that shift. Plaintiffs' notice (Docket Entry No. 173), Jeanie Dixon deposition at 19. In fact, Treetop's "Production Training Unit" manual for unit manager trainees states

> The *primary objective* at the Production Training Unit *is to become a proficient grill operator.* A second objective is to gain exposure to the daily management duties and responsibilities. . . .

Plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 117 at 2 (emphasis added).

Unit managers also wait on tables for absent waitresses.[4] Plaintiffs' notice (Docket Entry No. 173), Dixon deposition at 37. For other shifts, if an employee is absent, until a replacement employee arrives, the unit manager performs the functions of the absent employee's position. Plaintiffs' response (Docket Entry No. 184) ¶ 27.

A "very common" practice at Treetop restaurants is for hourly employees, who are cooks or grill operators on other shifts, to fill in for and perform the jobs of the unit manager when a unit manager is sick and the designated district relief manager is unavailable to cook. Plaintiffs' notice (Docket Entry No. 173), Bean deposition at 211–12, Timothy Harper deposition at 144–45.

The defendants do not maintain time records for unit managers as to scheduling time or the total hours these managers are at work. There is not any periodic survey or analysis of the amounts or percentages of time spent by unit managers on particular tasks. Defendants' motion (Docket Entry No. 174) for summary judgment, Exhibit I, defendants' answers to plaintiffs' first set of interrogatories, ¶¶ 1, 2 & 9. The only time analysis of the unit managers' actual activities on a weekly basis was provided by the plaintiffs who have worked in 31 different restaurants in 13 different cities/towns, and three different states. Plaintiffs' notice (Docket Entry No. 174), Exhibits D–G.

It is undisputed that all of these affiants have performed the multiple employee tasks at the Treetop restaurants at issue, including waiting on tables. Defendants' response (Docket Entry No. 188) ¶ 128. Based on the time analyses performed by the unit managers who submitted affidavits, the average number of hours they worked per week while employed by Treetop ranged from 87.32 to 90.76 hours. Some unit managers sometimes worked "triple shifts," or 24 hours straight in the restaurants and sometimes slept in the restaurants. Affidavit of Domingo Meza (filed August 17, 1999; Docket Entry No. 41) ¶¶ 38–39; *see also,* affidavit of Marc Cooper (Docket Entry No. 42) ¶¶ 37, 43 and affidavit of Robert Parsons (Docket Entry No. 43) ¶ 36.

Aside from total hours worked, several plaintiffs have filed affidavits estimating the percentages of time performing their different functions as unit managers. The range is from 83 percent to 93 percent of their time being involved in cooking, food preparation, washing dishes, waiting on tables, unloading trucks, pulling out stock and delivering money to the bank. Defen-

---

4. The Court notes that in his affidavit Mr. Cowan states that it is a standard practice at Treetop for unit managers to turn into Treetop any tips they make while waiting on tables. He states that when he was unit manager, he was not permitted to keep any tips he received from customers but was required to treat them as sales. Defendants' motion (Docket Entry No. 174) for summary judgment, Exhibit D, Cowan affidavit, ¶ 47.

dants' motion (Docket Entry No. 174) for summary judgment, Exhibit G, Riddle affidavit, ¶¶ 21, 21, 32–36; Exhibit E, McMahan affidavit, ¶¶ 33–37 and affidavit of Ronnie T.J. Richards (Docket Entry No. 45), ¶¶ 33–37.

Almost 100 percent of the unit manager's time is spent as a cook on the first shift. Of the total amount of functions, considering work on other shifts, cooking time for a workweek varies, ranging from approximately 36.02 percent to 71.34 percent.

Mr. Jay Ezell, Treetop's vice president of operations, found from his review of nine district relief managers, that on the average they spend 49 percent of their time as grill operators. He also found that one manager spent 75 percent of his time as a grill operator. *See* plaintiffs' notice (Docket Entry No. 172), Deposition Exhibits 64 and 69. One of the unit managers who is not a plaintiff in this lawsuit testified that the unit manager is cooking orders almost constantly during the first shift. Plaintiffs' notice (Docket Entry No. 173), Earl Barbour deposition at 13–16.

Donnie Bean, who has worked for Treetop as a division manager, unit manager and district manager, describes food preparation as a unit manager's primary function because when a decision on a promotion to unit manager arises, the critical question is, "Can she [or he] cook that volume?" Plaintiffs' notice (Docket Entry No. 173), Bean deposition at 8, 13, 14, 206–07. Additionally, the grill operator during the other two shifts is the "shift manager," who also fills in for the unit manager or the district relief manager when neither are available.

In contrast, as to management duties, *i.e.*, staff changing, scheduling, interviewing, hiring, training, and terminating employees, time expended by unit managers ranges from approximately 3.55 percent to 10.07 percent.[5] Defendants' motion (Docket Entry No. 174) for summary judgment, Exhibit D, Cowan affidavit, ¶ 33–35; Exhibit E, McMahan affidavit, ¶ 35–37; Exhibit F, Harper affidavit, ¶ 33–35 and Exhibit G, Riddle affidavit, ¶ 36; Meza affidavit (Docket Entry No. 41) ¶ 34–37; Cooper affidavit (Docket Entry No. 42) ¶¶ 33–36; Parsons affidavit (Docket Entry No. 43) ¶ 32–35; Richards affidavit (Docket Entry No. 45) ¶¶ 34–37. The unit managers do some recruiting and interviewing of applicants, hiring, training, disciplining, firing and managing of hourly employees and have the authority to recommend advancement or promotion. Defendants' motion (Docket Entry No. 174) for summary judgment, Exhibit G, Riddle affidavit, ¶ 30; Ezell affidavit (Docket Entry No. 175) ¶¶ 25–28; plaintiffs' response (Docket Entry No. 184) ¶ 22.

Yet, in practice, a unit manager spends little time on such matters, and other employees perform the unit manager's managerial duties. The unit manager normally does not monitor waitresses in performing their jobs on the first shift, and other hourly employees do not require much supervision.[6] Defendants' motion (Docket Entry No. 174) for summary judgment, Exhibit G, Riddle affidavit, ¶¶ 30, 38–40; plaintiffs' notice (Docket Entry No. 173), Patricia Morton deposition at 56–57, 132–133. On the first shift, the unit manager is at the grill cooking with his or her back to the restaurant. Plaintiffs' notice (Docket Entry No. 173) Morton deposition at 134–136, 291–294 and Jamie Cantrell deposition at 90; *see also*, defendants' motion (Docket Entry No. 174) for summary judgment,

---

**5.** Some unit managers frequently move among restaurants but are responsible for only one restaurant at a time. Defendant's motion (Docket Entry No. 174) for summary judgment, Exhibit G, Riddle affidavit, ¶ 4; Exhibit E, McMahan affidavit, ¶ 3; and Exhibit F, Harper affidavit, ¶ 3.

**6.** Ms. Riddle's affidavit is cited as representative since each of the plaintiffs' affidavits are, for all practical purposes, consistent with the other affidavits of Messrs. Cowan, McMahan, and Harper. *See* defendants' motion (Docket Entry No. 174) for summary judgment, Exhibits D, E, and F.

Exhibit G, Riddle affidavit, ¶ 40 and Exhibit D, Cowan affidavit, ¶ 39.[7]

The unit manager also records sales figures, reports the amounts to the home office, maintains time and payroll information, deposits sales receipts after the first shift and changes the cash drawers at shift change. See defendants' motion (Docket Entry No. 174) for summary judgment, Exhibit G, Riddle affidavit, ¶¶ 12, 20, 21 and 23; Howser affidavit (Docket Entry No. 202), Exhibit A. Yet, available hourly employees are also designated as "shift managers" to perform these duties. Plaintiffs' notice (Docket Entry No. 173), Nicholson deposition at 124–125, 128–129; Barbour deposition at 19–21; Ewell deposition at 40–41.

The proof reflects as to employee management that the district managers are actually responsible for directing co-employees. Treetop district managers do not have offices, and they spend their time each week in the three restaurants in their districts. See Plaintiffs' notice (Docket Entry No. 173), Paul Nicholson deposition at 129–130, Dixon deposition at 5–7, Barbour deposition at 56–57 and Kurtiss Ewell deposition at 56–57.

The district managers are also responsible for sales and profits in the restaurants in their district. Plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 99. Mr. Bean, a former manager at all three levels, stated in his deposition that even "simple decisions" concerning the restaurants are made by the district manager, not the unit manager. Plaintiffs' notice

(Docket Entry No. 173), Bean deposition at 36.

The district manager performs many of the duties formally assigned to the unit manager. A district manager recruits and hires employees and maintains written records (called "Recruiting Tracking Charts") of their recruitment efforts. Id., Bean deposition, at 37, 61–62, 73–74, 76, 102, 144–145, 150, 164–166 and Cantrell deposition at 20–21; plaintiffs' notice (Docket Entry No. 172), Deposition Exhibits 99 and 104. The district manager is also responsible for finding replacements for hourly employees who fail to appear for work. Plaintiffs' notice (Docket Entry No. 173), Bean deposition at 43, 57–58, 85–86; McMahan deposition at 81–82, 94–95. Although district managers also train employees at the restaurants, hourly "waitress trainers" or "unit trainers" are utilized to train hourly waitresses/servers.[8] Id., (Bean deposition at 144–150), Teresa Berner deposition at 53; plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 99.

The district manager must approve and sometimes withholds approval of employees recommended for hiring by the unit manager. Any "rehires" of ex-Treetop employees must be approved by the district manager. Plaintiffs' notice (Docket Entry No. 173), Bean deposition at 153–158, 37, and 101–102 and Nicholson deposition at 57–58; plaintiffs' notice (Docket Entry No. 172), (Deposition Exhibits 100 and 101). The district manager also approves the unit manager's decisions to terminate hourly employees, and any terminations without such approval are re-

---

7. The waitress delivers the customers' orders to the unit manager (or hourly cook/grill operator) by approaching the grill from either side and calling out the order to the unit manager. (Docket Entry No. 173,). After delivering the order to the unit manager, the waitress watches the unit manager to make sure that he pulls out the correct food for the order, and corrects the unit manager if a mistake is made, waiting by the grill until the unit manager corrects the mistake. Id. Unit managers cook almost constantly during the first shift. Plaintiffs' notice (Docket Entry

No. 173), Cantrell deposition at 90–91 and Barbour deposition at 13–16.

8. Each restaurant has a "unit trainer" or "waitress trainer" who is an hourly waitress/server and is responsible for training all of the waitresses, who make up the vast majority of newly hired employees. Plaintiffs' notice (Docket Entry No. 173), Berner deposition at 53 and Earl Barbour deposition at 32–35.

versed. *Id.*, Cowan deposition at 68, 73, 138; Morton deposition at 89, 90, 143, 319, 320; Harper deposition at 64, 80, 89–90, 92, 97, 98, 100, 108, 112–113; Ewell deposition at 55; Nicholson deposition at 59, 60, 62; McMahan deposition at 65–67, 75.

During his visits to the restaurants in his district, the district manager corrects any improper work in the restaurants. *Id.*, Nicholson deposition at 129–130; Dixon deposition at 5–7; Barbour deposition at 56–57; Ewell deposition at 56. The district manager periodically assigns the unit manager and the hourly employees a list of cleaning duties before their shift ends. *Id.*, Nicholson deposition at 116–117. After the first shift, a district manager does the stock pull from inventory. *Id.*, Dixon deposition at 20; *see also* plaintiffs' notice (filed January 11, 1999; Docket Entry No. 173) of filing deposition excerpts, Donnie Bean deposition at 40–41.

District managers approve any staffing schedules. *Id.*, Bean deposition at 41, 49, 52, 56, 61–62, 145, 150; Cantrell deposition at 20, 21; Harper deposition at 69, 73 and plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 84. Some district managers rearrange shifts of hourly employees in restaurants. Plaintiffs' notice (Docket Entry No. 173), Bean deposition at 172. District managers schedule all in-restaurant meetings with hourly employees, sometimes without the unit manager; and division and district managers meet weekly concerning the restaurants without the unit managers. Plaintiffs' notice (Docket Entry No. 173), Bean deposition at 26, 52–53; Harper deposition at 92. District managers also hear employee grievances at the restaurants *Id.*, Morton deposition at 260; Nicholson deposition at 88. The district manager investigates shift-thefts at the restaurants. *Id.*, Bean deposition at 68; McMahan deposition at 106–107; Morton deposition at 143.

A memorandum, dated March 23, 1998, from a Treetop representative directs district and division managers to "physically direct traffic during the shift change" in the restaurant and to take note of employees on the first shift who "lay out or are late" and "put them on a shift where they can be on time and make it to work." Plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 107.

Gene Ingram, a vice president of operations and area manager at Treetop who is responsible for 36 restaurants, described some of the restaurant responsibilities and active supervisory involvement of the district managers in a handwritten note, that reads in pertinent part, as follows:

> Training—*district mgrs. are in charge* of training all shifts. Meet each employee by name, work all shifts. Observe the shift. *You set standards—uniforms, cost control,* greeting, *everything they do.*
>
> . . . . .
>
> *Staffing is part of your pay!
>
> . . . . .
>
> *Do—recruit weekly,* show concern, go to unit and roll up sleeves and go to work. Stay out of back room. Most problems [arise] out front.
>
> . . . . .
>
> District [Manager] job!! (1) *Sales* (2) *Profit* (3) *People* ... Staff them and they will come. *Staffing is the job of the District [Manager].*

Plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 99, 1, 2 and 3 (emphasis in original in part and added in part).

In a memorandum of May 28, 1998, the defendant, James Shaub, described in detail a four-step system by which the district manager, division manager, and area manager are to plan the number of employees who are to be scheduled in each restaurant during each week, anticipate increased sales on weekends and special events and make sure that the weekly schedule posted in the restaurants complies with the scientific staffing guidelines. Also, district managers are to correct any errors, call the unit managers in

the restaurants within 30 minutes after each shift begins to determine whether the restaurant is staffed with employees in accordance with the scientific staffing guidelines, and take steps to evaluate and correct any deficiencies in staffing in the restaurants. Plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 84.

On its "People Quota Sheet," Treetop clearly states that if a restaurant becomes short-staffed, the district manager bears the actual responsibility for taking the necessary steps to increase the number of hourly employees:

1. The District Manager is *responsible* for bringing the unit "in bounds."

2. Using this form, the District Manager will determine exactly how many salespeople and cooks the unit is short. The District Manger should then call the Division Manager by Thursday with these numbers.

3. District Manager will organize a Stop & Hire campaign conducted daily until the unit is "in bounds."

*Id.* at Deposition Exhibit 86 (emphasis added).

In theory, unit managers are to order "food from the company commissary and local vendors once or twice a week." Ezell affidavit (Docket Entry No. 175) ¶ 29. In fact, the unit manager pulls food items from the cooler/commissary to maintain the stock at certain levels. Defendants' motion (Docket Entry No. 174), Exhibit G, Riddle affidavit, ¶ 20. The unit manager has the authority to refuse unsatisfactory food orders from vendors. Plaintiffs' response (Docket Entry No. 184) to defendants' statement of undisputed facts, ¶ 30. Yet, it is undisputed for the purpose of ruling on defendants' motion for summary judgment that the order for supplies is actually determined by the district manag-

er. Plaintiffs' notice (Docket Entry No. 173), Riddle deposition at 132–133, 155; Bean deposition at 49, 52.[9]

Although the unit manager is responsible for insuring that the environment both inside and outside the restaurant, is safe, clean, appealing and inviting, Ezell affidavit (Docket Entry No. 175) ¶ 23, the district manager shares in the efforts to ensure cleanliness in the restaurant. (Docket Entry No. 173), Nicholson deposition at 116, 117; Dixon deposition at 6–7; Cantrell deposition at 25–26.

The defendants claim that unit managers are responsible for handling customer complaints and responding to calls at home during the second and third shifts. Defendants' statement (filed January 11, 1999; Docket Entry No. 177) of undisputed facts ¶¶ 39–40. Although the plaintiffs agree that unit managers do receive calls at home about problems at their unit, they claim that waitresses handle many of the customer complaints and that the unit manager's involvement is infrequent. Plaintiffs' response (Docket Entry No. 184) ¶¶ 39 and 40.

District managers instruct unit managers to report any "serious matters" to them. Plaintiffs' notice (Docket Entry No. 173), Morton deposition at 260. For legal problems, the unit manager has access to a book known as the *Waffle House Way* that contains a "legal section" which includes "a general list of legal, employment, and labor issues available for the unit manager to review in the event a particular situation or problem occurs." Ezell affidavit (Docket Entry No. 175) ¶ 22. Sexual harassment complaints are reported initially to the unit manager, then to the district manager, who comes to the restaurant to confront and meet with the accused to remedy the problem. Plaintiffs' notice

---

**9.** Moreover, an hourly employee is sometimes designated as "shift manager" with a key to the commissary to pull stock from the commissary. An hourly waitress also handles deliveries of stock items to the store, such as bread, eggs, and milk, and sometimes pays the vendors, gets receipts and places them in the cash register. *Id.*, Morton deposition at 175; Nicholson deposition at 128, 129; Barbour deposition at 19, 22; Ewell deposition at 40; McMahan deposition at 59, 61; Riddle deposition at 116, 119.

(Docket Entry No. 173), Nicholson deposition at 88–89. A 1–800 hotline number is posted in all of Treetop's restaurants for employees to call to complain of sexual harassment. *Id.* at 90–91.

## II.

The Court addresses first the plaintiffs' motion to strike and the defendants' motion to supplement the record, as those motions go to the scope of the proof to be considered on the parties' cross-motions for summary judgment.

### Plaintiffs' Motion to Strike

The defendants submitted the expert report of Dr. Deivanayagami which states that the unit manager position in Treetop's restaurants is a management position in conception, perception and practice (Docket Entry No. 195). In Dr. Deivanayagami's opinion, the unit manager is the person in charge of the unit with responsibility for the day-to-day operations of the restaurant as a profit-making entity. Affidavit of Dr. Deivanayagam (filed February 11, 1999; Docket Entry No. 195) ¶ 9.

The plaintiffs' motion to strike the defendants' expert report argues that the expert's report is unsigned, his methodology is unreliable, and his opinion addresses the ultimate legal issue for which an expert opinion is unnecessary. In their response, the defendants argue that the expert's subsequent affidavit cures his prior unsigned report, that the expert relies upon expert reports admitted in Waffle House's prior FLSA action and that an expert's expression of opinion on the ultimate issue is permissible.

The report at issue by Dr. Deivanayagam, who is a professor of industrial engineering at Tennessee Tech University, involves the findings from four interviews with Treetop unit or district relief managers and a review of Treetop's policies, as well as the reports of the two experts in a prior 1983 FLSA action against Waffle House restaurants.[10] Affidavit of Dr. Deivanayagam (filed February 11, 1999; Docket Entry No. 195). Dr. Deivanayagam's report reflects that as an industrial engineer, he analyzes jobs, such as that of Treetop's unit managers, and evaluates the "conception, perception and practice" of those jobs. *Id.*, ¶ 7. Dr. Deivanayagam opines that upon his review, the unit manager at a Treetop restaurant is "primarily responsible for the profitable operation of the restaurant." *Id.*, ¶ 9. This part of his opinion is based on a documentary review of job titles, the *Dictionary of Occupational Titles,* Treetop's organizational charts, and interviews. As to perception, Dr. Deivanayagam interviewed four unit or district relief managers and quotes their anecdotal comments from his interviews. Based on these reviews and interviews, Dr. Deivanayagam believes that these employees perform the management functions cited by Treetop.

The admission of expert testimony is governed by Federal Rules of Evidence:

Rule 702. Testimony by Experts

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 703. Basis of Opinion Testimony by Experts

**10.** The Secretary of Labor filed another action against the prior franchiser, Waffle House, Inc., alleging similar violations of the minimum wage, overtime and record keeping provisions of the FLSA for its unit managers. In 1983, the United States District Court for the Northern District of Georgia held that the Waffle House employees known as unit managers were "bona fide executive employees" under the FLSA and, thus, exempt from the payment of overtime compensation. *Donovan v. Waffle House, Inc.,* No. C81–609A, 1983 WL 2108 (N.D.Ga. Sept.26, 1983). The plaintiffs do not challenge the court's holding based upon the work of the unit managers in 1983 as developed in that record. They contend that the facts in this action are materially different.

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Moreover, under Federal Rule of Evidence 104(a), the Court must make a threshold determination as to whether the expert's opinion should be admitted. Likewise, Federal Rule of Civil Procedure 56(e) only permits consideration of evidence admissible under the Federal Rules of Evidence.

The United States Court of Appeals for the Sixth Circuit has observed that "close judicial analysis of such technical and specialized matter is necessary not only because of the likelihood of juror misunderstanding, but also because expert witnesses are not necessarily always unbiased scientists. They are paid by one side for their testimony." *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1352 (6th Cir.1992). "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible ...." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir.1987) (citations omitted); *Robinson v. Union Carbide Corp.*, 805 F.Supp. 514, 523 (E.D.Tenn.1991).

The Supreme Court of the United States in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), imposed a gate-keeping role upon the district courts for expert opinion testimony based on scientific knowledge. *Daubert* requires that "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method", *i.e.*, "a grounding in the methods and procedures of science ... [that] connotes more than subjective belief or unsupported speculation" and that "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." *Id.*, 509 U.S. at 590, 113 S.Ct. at 2795, 125 L.Ed.2d at 481 (quoting in part *Webster's Third New International Dictionary*, 1252 (1986)). The requirement that an expert's testimony pertain to "scientific knowledge" utilizes a standard of evidentiary reliability. *Id.* In a footnote, the Court emphasized that, "our reference here is to *evidentiary* reliability—that is, trustworthiness." *Id.* at 590 n. 9, 113 S.Ct. at 2795 n. 9, 125 L.Ed.2d at 481 n. 9 (emphasis in original) (citations omitted). Further, the Court emphasized that "[t]he focus, of course, must be solely upon principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. at 2797, 125 L.Ed.2d at 484.

In *Daubert*, the Court listed the following factors for consideration of whether the opinion testimony involves scientific knowledge.

[W]hether [the theory or technique] can be (and has been) tested....

[W]hether the theory or technique has been subjected to peer review and publication.....

[I]n the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error, ....

. . . . .

Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique

which has been able to attract only minimal support within the community," ... may properly be viewed with skepticism. *Id.* at 593–94, 113 S.Ct. at 2796–97, 125 L.Ed.2d at 482–83 (citations omitted). These principles apply also to non-scientific expert opinions. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Another consideration is the "fit" or "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985), *accord United States v. Bonds,* 12 F.3d 540, 557 (6th Cir.1993).

As this Court noted, there are additional questions and factors that can be asked in evaluating expert testimony:

(5) *Are the underlying data untrustworthy for hearsay or other reasons? (6) Does the underlying data exclude other causes to a reasonable confident level?* (7) What do the leading professional societies say about this specialty or this type of testimony? (8) How much of the technique is based on the subjective analysis or interpretation of the alleged "expert?" (9) The judge's experience and common sense.

*Hein v. Merck & Co.,* 868 F.Supp. 230, 231 (M.D.Tenn.1994) (emphasis added).

The Ninth Circuit in the remand of *Daubert* added yet another factor, *i.e.,* whether the expert's opinion is a product of independent research or whether the opinion was formulated for the litigation. *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995).

As to the admissibility of similar expert reports in the prior FLSA action involving Waffle House, *Donovan v. Waffle House, Inc.,* No. C81–609A, 1983 WL 2108 (N.D.Ga. Sept.26, 1983), the district court admitted expert testimony of industrial engineers on the work of unit managers at Waffle House's restaurants. On this issue the Court stated:

The court *finds that on the basis of the activity analysis conducted by the defendants' expert with some adjustment based on Dr. Dean's study,* the usual or typical unit manager for Waffle House spends 57% of his time in activities which are neither managerial nor closely and directly related to his management responsibilities.

Drs. Lehrer and Fyffe from Georgia Tech provided expert testimony for the defendants from the perspective of a "responsibilities" or operations analysis and testified that in their opinion, utilizing accepted industrial engineering management concepts, theories and considerations, the unit manager would be considered in charge of, and responsible for, the unit in the sense in which that term is ordinarily understood by industrial engineering experts. The court credits their testimony. *The court is influenced not only by the opinion of these professionals, but also by the tests or analyses performed, which Dr. Lehrer referred to as the PAO (Position Analysis Questionnaire).* These tests, which were administered in order to evaluate the responsibilities of unit managers against responsibilities for decision making, communications and general responsibility of others in American industry, found that the unit manager's quotient of responsibility was 893, whereas the grill cook's was 509, suggest[ing] a fairly substantial spread in management responsibilities between these two employee groups....

*Id.* at *4 (emphasis added).

■ Here, the Court concludes that the plaintiffs' motion to strike should be granted. First, the methodology of the experts in the prior *Waffle House* action was based in significant part upon extensive statistical and empirical analyses. Dr. Deivanayagam's recent report does not reflect such underlying analyses, and accordingly, his

methodology leaves the Court unconvinced as to the reliability of his findings.

■ Moreover, the Court is concerned that Dr. Deivanayagam's opinion is expressed in terms that the unit manager is primarily responsible for the profitable operation of the restaurant. The term "primary responsibility" has a distinct legal meaning under FLSA regulations. *See* 29 C.F.R. § 541.1. In the Sixth Circuit, while an expert can render an opinion on the ultimate issue, the expert cannot opine on a legal issue. *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir.1994). "The best resolution of this type of problem is *to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate . . . .*" *Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir.1985) (emphasis added) (citations omitted). Here, Dr. Deivanayagam's opinion about the unit manager's "primary responsibility" utilizes a distinct legal concept and should be excluded under *Berry* and *Torres*.

The Court concludes that in accordance with *Daubert* this expert report lacks the reliability necessary for its admission. Moreover, whether the unit managers' duties are primarily managerial as in the precise wording of the FLSA regulations is a matter for the Court to decide. Finally, given the state of the factual record, the Court finds that admission of this expert's opinions would not alter the conclusions reached herein.

### Defendants' Motion to Supplement

■ In this motion, the defendants seek to supplement their statement of undisputed facts, citing a memorandum opinion in *Mertz v. Treetop Enterprises, Inc.*, No. CV 96–B–1208–S (N.D.Ala. March 3, 1999), making findings about the functions of Waffle House unit managers in Alabama. These "findings" in the second FLSA action against Treetop were, in pertinent part, as follows:

One unit manager is assigned to each restaurant in each district. This individual unit manager, under Treetop's Policy and Procedures, is responsible for hiring, training, disciplining, and firing of employees, as well as setting the work schedules for the hourly employees. The unit manager is responsible for answering employee questions concerning Treetop's pay policies and resolving payroll related problems for hourly employees. The individual unit manager assigned to each unit is charged with the responsibility in that unit of insuring that payroll and record keeping are in compliance with the FLSA. Although Treetop has enacted uniform pay policies applicable to all hourly employees, each unit manager is afforded a certain amount of discretion in administering these policies within his or her area of responsibility.

Affidavit of Hugh C. Howser, Jr. (filed March 12, 1999; Docket Entry No. 202), Exhibit A at 3.

In response, the plaintiffs submit an affidavit of W. Lewis Garrison, counsel for the plaintiffs in *Mertz*, who asserts that the findings of fact in the cited memorandum are based upon stipulations entered into at the request of defendants' counsel. Mr. Garrison asserts that these findings were not based upon or tested in discovery. In addition, Mr. Garrison notes that Treetop's findings were adopted verbatim by the Court. Declaration of W. Lewis Garrison, Jr. (filed March 30, 1999; Docket Entry No. 207).

■ This Court notes that the ruling in *Mertz* was upon a motion to reconsider a denial of those plaintiffs' motion to amend, as well as their motion to proceed as a collective action. Usually courts do not make findings of fact as to the legal sufficiency of a proposed amendment to a complaint because such motions go to the legal sufficiency of the allegations, as well as other factors, but not factual findings on the merits of claims.

Under Federal Rule of Civil Procedure 15(a), amendments to a complaint are permitted as a matter of right prior to the filing of an answer and thereafter are to be freely granted. The standard for determining whether to allow any amendment to a complaint was articulated by the Supreme Court in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), where the Court explained:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of an amendment, etc.—the leave sought should, as the rules require be "freely given."

*Id.*, 371 U.S. at 182, 83 S.Ct. at 230, 9 L.Ed.2d at 226. *See also Schiavone v. Fortune*, 477 U.S. 21, 29–30, 106 S.Ct. 2379, 2384, 91 L.Ed.2d 18, 27–28 (1986).

"[T]he thrust of Rule 15 is to reinforce the principle that cases 'should be tried on the merits rather than the technicalities of pleadings.'" *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir.1986), citing *Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir.1982). Under these precedents, findings of facts on a motion to amend seem inappropriate.

Moreover, both the Supreme Court and the Sixth Circuit have expressed disapproval of a court's verbatim adoption of findings of fact submitted by counsel. *Anderson v. City of Bessemer*, 470 U.S. 564, 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("We, too have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citations to the record."); *Kilburn v. United States*, 938 F.2d 666, 671 (6th Cir.1991) ("Appellate courts generally frown on the wholesale adoption of findings of fact and conclusions of law submitted by one of the parties"). The "concern is ... with the *adequacy* of the findings." *Kilburn*, 938 F.2d at 672 (quoting *Andre v. Bendix*, 774 F.2d 786, 800 (7th Cir.1985) (emphasis in original)). Yet, the findings are to be respected unless clearly erroneous. *Anderson*, 470 U.S. at 572, 105 S.Ct. at 1510–11, 84 L.Ed.2d at 527; *Kilburn*, 938 F.2d at 677.

Here, the factual findings in *Mertz* were based upon a stipulation of the parties about Treetop's operations. Although, the legal context in which these findings were made raises concerns about the adequacy of these findings, these concerns go to the weight of these factual findings, not to their admissibility. Thus, the defendants' motion to supplement its statement of undisputed facts shall be granted. However, the probative value of how Waffle House unit managers operate in the restaurants in the prior action is marginally relevant to these plaintiffs' claims of Treetop's method of operation at the restaurants at which plaintiffs work or worked as unit managers.

### III.

The Court shall now address the parties' cross-motions for summary judgment.[11]

As provided by Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter

---

11. Upon review of the parties' responses to each other's statements of undisputed facts (Docket Entry Nos. 184, 188, and 198), most of the material facts on the issue of liability are not disputed. Disputes arise from the parties' characterization of facts and legal precedents. Other factual disputes are not material under the applicable law.

of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202, 211 (1986). In its consideration of the evidence, the Court must view all facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. *Davidson & Jones Dev. Co. v. Elmore Dev. Co.*, 921 F.2d 1343, 1349 (6th Cir.1991).

In order to prevail on a summary judgment motion, the moving party bears the burden of proving the absence of a genuine issue of material fact concerning an essential element of the opposing party's action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986); *Davidson & Jones Dev. Co.*, 921 F.2d at 1349; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A dispute about the material fact must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." [12] *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. Since the preponderance of the evidence standard is used in this determination, more than a mere scintilla of evidence in support of the plaintiff's position is required. *Id.* at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

Once a motion for summary judgment has been made, "the non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co.*, 921 F.2d at 1349. The non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and estab-

lishing the existence of a genuine issue of material fact. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274; *Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir.1989). While the disputed issue does not have to be resolved conclusively in favor of the non-moving party to defeat summary judgment, "sufficient evidence supporting the claimed factual dispute" must be shown, thereby requiring resolution of the parties' differing versions of the truth by a jury or judge. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, 592 (1968).

In their motion for partial summary judgment, the plaintiffs contend that they are entitled to summary judgment on the defendants' liability [13] on their FLSA claims because (1) the defendants cannot meet the required burden of proof to demonstrate their executive employees' exempt status under the FLSA; (2) the undisputed facts show that the plaintiffs' primary duty as unit managers is being grill operators or cooks on the first shift; (3) a mere documentary listing of supervisory duties of a unit manager cannot carry the defendants' burden of proof on this exemption; and (4) the plaintiffs' extraordinary percentage of time spent as unit managers on non-management work, coupled with the substantial supervisory duties shared with district managers and co-employees at each restaurant, preclude a finding that the unit managers' primary duties are managerial.

---

**12.** The Supreme Court further explained that a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

**13.** Treetop and William E. Ezell, III, have admitted their status as employers under FLSA. However, in their motion for partial summary judgment, the plaintiffs also allege

liability on the part of James Shaub, a corporate officer and shareholder at Treetop, for FLSA violations as an "employer" under 29 U.S.C. § 203(d), which is disputed by the defendants. Plaintiffs' memorandum (filed January 11, 1999; Docket Entry No. 169) in support of their motion for partial summary judgment at 23; defendants' memorandum (filed January 11, 1999; Docket Entry No. 176) in support of their motion for summary judgment at 23.

In their motion for summary judgment, the defendants argue [14] in essence that (1) a prior federal court decision under the FLSA found Waffle House's unit managers to be exempt executive employees and that holding is supported by other court decisions; [15] (2) the unit managers at these restaurants perform a variety of duties that are primarily managerial; (3) the percentage of time factor on non-management work is not controlling on the primary duty question and (4) as the sole employee in charge of the restaurant, the unit manager is an exempt employee under the FLSA.

The plaintiffs allege that they should have been paid overtime for hours they worked in excess of 40 per week and cite the FLSA, which provides in pertinent part as follows:

> No employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a).

The defendants claim that the plaintiffs are exempt from the above requirement because they are "employed in a bona fide executive capacity." 29 U.S.C. § 213(a)(1).

 As to the substantive law, exemptions from FLSA coverage are to be narrowly construed. *Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 296 n. 13, 105 S.Ct. 1953 n. 13, 85 L.Ed.2d 278 n. 13 (1985); *Brock v. National Health Corp.*, 667 F.Supp. 557, 28 W.H. Cases 342, 348 (M.D.Tenn.1987). Treetop, as an employer, must prove that each employee is exempted by plain and unmistakable evidence. *Hodgson v. The Klages Coal and Ice Company*, 435 F.2d 377, 382 (6th Cir.1970) *cert. denied*, 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137 (1971); *Marshall v. Hendersonville Bowling Ctr.*, 483 F.Supp. 510, 517 (M.D.Tenn.1980) *aff'd, without op.*, 672 F.2d 917 (6th Cir.1981). The employer also must show that each employee meets each and every requirement for the exemption. *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966) *reh. den.* 383 U.S. 963, 86 S.Ct. 1219, 16 L.Ed.2d 305 (1966); *Pezzillo v. General Tel. & Electron, Information Sys., Inc.*, 414 F.Supp. 1257, 1268 (M.D.Tenn.1976), *aff'd* 572 F.2d 1189 (6th Cir.1978). Proof of representative workers and their recollections can establish the claims of all workers, *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 685 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), particularly where the employer did not maintain records of the uncompensated work. *Martin v. Deiriggi*, 985 F.2d 129, 132 (4th Cir.1992).

 In addition to the Act, the Administrator of the United States Department of Labor, Wage and Hour Division, has promulgated regulations under the FLSA that are given "the force and effect of law." *Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448, 456 n. 9 (1977). These regulations are accorded great weight by the courts in applying the FLSA. *Walling v. Wall Wire Products*, 161 F.2d 470, 475 (6th Cir.1947), *cert. denied*, 331 U.S. 828, 67 S.Ct. 1351, 91 L.Ed. 1843 (1947). In *Walling*, the Court noted "the persuasiveness ... of the view of those experienced in the administration of the Act." *Id. See also, Hodgson v. Barge, Waggoner & Sumner*, 377 F.Supp. 842, 844 (M.D.Tenn.1972), *aff'd*, 477 F.2d 598 (6th Cir.1973).

14. The defendants also put forth a good faith defense under the Portal–to–Portal Act, 29 U.S.C. § 255, and allege that 29 U.S.C. § 260 removes liability for liquidated damages.

15. *See Waffle House*, 1983 WL 2108, *Murray v. Stuckey's, Inc.*, 939 F.2d 614 (8th Cir.1991), *cert. denied*, 502 U.S. 1073, 112 S.Ct. 970, 117 L.Ed.2d 135 (1992), *Meyer v. Worsley Companies*, 881 F.Supp. 1014, 1020 (E.D.N.C.1994).

■ The decisional law and FLSA regulations provide that the employer-employee relationship is based upon the "economic reality" test, considering all of the circumstances of the employment relationship rather than its "technical concepts" to determine whether an employee is subject to the terms of the Act. *Tony and Susan Alamo Foundation,* 471 U.S. at 301, 105 S.Ct. at 1961, 85 L.Ed.2d at 288; *Justice v. Metropolitan Gov't of Nashville Davidson County,* 4 F.3d 1387, 1392 (6th Cir. 1993); 29 C.F.R. § 779.19.

The crucial issue here is whether the plaintiffs were or are *bona fide* executive employees exempt from FLSA's overtime provisions under 29 U.S.C. § 213(a)(1). The resolution of the issue turns on a two-fold analysis of the unit manager job description and actual job duties, as well as the relevant legal principles.

■ As to whether an employee is a "bona fide executive" within the meaning of § 213(a)(1) of the FLSA, and thereby exempt from FLSA overtime requirements, the Sixth Circuit has succinctly defined a *bona fide* executive "as an employee with supervisory duties who is paid on a salary basis." *Michigan Supervisors' Office and Prof'l Employees Int'l Union v. Michigan Dept. of Corrections,* Nos. 94–1203, 94–1264, 1995 WL 418069, at *7 (6th Cir. July 13, 1995), (quoting *Michigan Assn. of Gov't'l Employees v. Michigan Dept. of Corrections,* 992 F.2d 82, 83 (6th Cir.1993)) (per curiam). To qualify the "employee must have both supervisory duties and be paid on a salaried basis." *Id.*

The Administrator has delineated the following factors to determine whether the employee is a "bona fide executive," *i.e.,* an employee

(a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department [or] subdivision thereof; and

(b) Who customarily and regularly directs the work of two or more other employees therein; and

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretionary powers; and

(e) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section: *Provided, That this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment,* or who owns at least a 20–percent interest in the enterprise in which he is employed; and

(f) *Who is compensated for his services on a salary basis at a rate of not less than $155 per week* (or $130 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands, or American Samoa), exclusive of board, lodging, or other facilities: *Provided, That an employee who is compensated on a salary basis at a rate of not less than $250 per week* (or $200 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands or American Samoa), exclusive of board, lodging, or other facilities, and *whose primary duty consist[s] of the management of the enterprise in which the employee is employed* or of a customarily recognized department or subdivision thereof, and *includes the customary and regular direction of the work of two or more other employees*

*therein,* shall be deemed to meet all the requirements of this section.

29 C.F.R. § 541.1. (emphasis added) (italics in original).

These factors are divided into two tests, the "long test" and the "short test," to determine whether or not an employee is exempt as an executive. The long test is applied to an employee whose salary basis is "at a rate of not less than $155 nor more than $249 per week" and "factors (a) through (e) must be considered in making the critical determination. If, however, the employee is paid a salary of 'not less than $250 per week,' then the 'short test' may be applied, and the court need only consider two factors: (i) whether the employee's primary duties are management of the enterprise or a subdivision thereof, and (ii) whether the employee regularly and customarily directs the work of two or more other employees ...." *Meyer,* 881 F.Supp. at 1018 (citation omitted); *see also, Stein v. J.C. Penney Co.,* 557 F.Supp. 398, 402, 403, n. 4 (W.D.Tenn.1983).

 As applied here, in his affidavit, Mr. William Ezell states that district relief managers earn a salary of $250.00 per week or greater and are eligible for bonuses. The beginning salary for unit managers is "$850.00 per period" (4 weeks) which averages out to $212.50 per week. They are eligible for bonuses, but also for adjustments for lost sales.[16] Ezell affidavit (Docket Entry No. 175) ¶ 34. Accordingly,

the Court must apply both the long and the short tests to the plaintiffs' claims.

### 1. *The long test*

**a. "Primary duty consists of the management of the enterprise ... or ... a customarily recognized ... division thereof"**

As to what is considered management in a firm, the FLSA regulations read as follows:

(a) In the usual situation the determination of whether a particular kind of work is exempt or nonexempt in nature is not difficult. In the vast majority of cases the bona fide executive employee performs managerial and supervisory functions which are easily recognized as within the scope of the exemption.

(b) For example, it is generally clear that work such as the following is exempt work when it is performed by an employee in the management of his department or the supervision of the employees under him: *Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purposes of recommending promotions or other changes in their status;* handling their com-

---

**16.** The parties do not dispute that the unit managers are paid a salary and are eligible for a number of bonuses which are related to the net profits of their assigned restaurant. Defendant's motion (Docket Entry No. 174) for summary judgment, Exhibit G, affidavit of Pam Riddle, ¶ 53. The defendants effectively admit that unit managers are not uniformly paid a beginning salary of $250.00 a week, but that all district relief managers are paid a salary of at least $250.00 a week. Ezell affidavit (Docket Entry No. 175) at 34. Although unit managers are paid a set salary, their salaries are subject to reduction for any casualty losses sustained by the restaurant, including any returned checks of customers. Defendants' motion (Docket Entry No. 174) Exhibit G, Riddle affidavit, ¶¶ 48–51. Treetop is also

passing along its legal costs in this action to its unit managers and district relief managers by docking their pay for these costs. Plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 111.

A unit manager's median compensation is $35,000.00. Ezell affidavit (Docket Entry No. 175) ¶ 34. Yet, several unit managers state that their paychecks have been routinely docked hundreds of dollars and that based upon the total number of hours that they work during a certain period of time, their actual compensation is little more than payment of the minimum wage. Defendants' motion (Docket Entry No. 174) Exhibit G, Riddle affidavit, ¶ 51; Exhibit F, Harper affidavit, ¶ 43; Exhibit D, Cowan affidavit, ¶ 53.

690

plaints and grievances and disciplining them when necessary; *planning the work; determining the techniques to be used;* apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; *controlling the flow and distribution of materials* or merchandise and supplies; providing for the safety of the man and the property.

29 C.F.R. § 541.102(a) and (b) (emphasis added).

The FLSA regulations provide that whether "management is the primary duty of the employee" is "based on all the facts of a particular case." 29 C.F.R. § 541.103. The Department of Labor utilizes a 50 percent rule of thumb, *i.e.,* whether 50 percent of the employee's duties are primarily managerial. *Id.* See *Jones v. ENSR Corp.,* No. 96–3836, 1997 WL 369440, at *3 (6th Cir.1997).

Of particular note here is a series of FLSA decisions on franchises and their lower level managers who perform management as well as other functions and whether such managers are exempt from FLSA. *Murray v. Stuckey's, Inc.,* 50 F.3d 564 (8th Cir.1995), *cert. denied,* 516 U.S. 863, 116 S.Ct. 174, 133 L.Ed.2d 114 (1995) (*Murray II*); *Murray v. Stuckey's Inc.,* 939 F.2d 614 (8th Cir.1991), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 970, 117 L.Ed.2d 135 (1992); *Donovan v. Burger King Corp.,* 675 F.2d 516 (2d Cir.1982) (*Burger King II*); *Donovan v. Burger King Corp.,* 672 F.2d 221 (1st Cir.1982) (*Burger King I*); *Waffle House,* 1983 WL 2108; *Glefke v. K.F.C. Take Home Food Co.,* No. 92–74371, 1993 WL 521993 (E.D.Mich. Aug.27, 1993). Although these authorities, particularly *Waffle House,* are relevant, the FLSA regulations make it clear that the issue of whether a particular employee or group of employees has management functions as a primary duty, "must be based on all the facts in a particular case." 29 C.F.R. § 541.103.

In any event, certain principles are readily discernible from these decisions: (1) "the need to obtain the [higher] manager's approval to fire an employee [or to make other decisions] . . ." is alone insufficient to disestablish exempt status, *Murray II,* 50 F.3d at 569; (2) "[t]he mere fact that a superior comes in for a one- or two-day visit" is likewise insufficient, *Murray I,* 939 F.2d at 619 (quoting *Waffle House,* 1983 WL 2108, at *10); (3) a franchise's well-defined policies and insistence upon "adherence to 'the book'" yielding detailed routine from some of its lower level managers will not cause a loss of exempt status, *Donovan II,* 675 F.2d at 521–22; *see also, Donovan I,* 672 F.2d at 226; and (4) the "percentage of time [spent in performing management functions] is not determinative of the primary duty question," *Glefke,* 1993 WL 521993, at *5. As reflected by *Glefke,* the primary duty question requires consideration of multiple factors listed in § 541.1.

Here, as to the primary duty factor in § 541.1(a), the Waffle House restaurants are distinct entities or divisions of Treetop. Although there are common methods of operation, with its profit based method of compensation for its managers by unit sales, each unit or restaurant is distinctive. Ezell affidavit (Docket Entry No. 175) ¶ 34.

The key issue is determining the primary duty of the unit managers. On the "primary" duty issue, under the FLSA [t]he amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent of the employee's time. . . . *Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the*

*other pertinent factors support such a conclusion.* Some of these pertinent factors are *[1] the relative importance of the managerial duties as compared with other types of duties, [2] the frequency with which the employee exercises discretionary powers, [3] his relative freedom from supervision, and [4] the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.*

29 C.F.R. § 541.103. *See also,* defendants' motion (Docket Entry No. 174) for summary judgment, Exhibit J, Department of Labor, Wage & Hour Division's *Field Operations Handbook.*

A critical source of information for this factor is Treetop's corporate documents that characterize the "primary" nature of the training for a unit manager's job. Its "Production Training Unit" manual for unit manager trainees states:

> The *primary objective* at the Production Training Unit *is to become a proficient grill operator.* A second objective is to gain exposure to the daily management duties and responsibilities.

Plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 117 (emphasis added).

Another critical factor is the structure of Treetop's restaurant operations that underscores the "primary objective" of the unit manager's training. The parties agree that the first shift from 7:00 a.m. to 2:00 p.m. generates most of the sales for Treetop's restaurants and that the unit managers are designated to be the grill operators for this shift and then the backup grill operators for the other shifts. Ezell affidavit (Docket Entry No. 175) ¶¶ 24d and 24e. As stated earlier, Mr. Bean cites food preparation as a unit manager's primary function because the critical determination for being placed in this position is the volume of food the applicant is able to cook. Additionally, the grill operator for the other two shifts is the "shift manager," who also fills in for the

unit manager or the district relief manager if they are unavailable.

As to the management of others on the first shift, it is undisputed that when the unit manager is serving as grill operator, his or her back is turned away from the waitresses and customers. Given the physical position of the unit manager and the need to focus attention on the key ingredient of the business, *i.e.,* the food to be prepared and served, a reasonable inference is that significant supervision by the unit manager on the first shift is highly unlikely.

As to all shifts, the unit managers' time analysis reflects that unit managers spend 88 percent to 93 percent of their time on non-management functions. As discussed in more detail, *infra,* the close involvement of the district manager in the details of the restaurant operation, including recruiting and approving hiring, as well as discharges and staffing, undermines the frequency of the unit managers' exercise of these functions. Of course, the unit managers in Treetop's restaurants attribute 5 to 6 percent of their time as being expended on managerial assignments.

As discussed previously, the unit manager is assigned "responsibility" for a number of managerial functions. Yet, these various aspects of the business for which the unit manager is "responsible" must be considered in context with what the unit manager actually does. Otherwise, the employer's handbook on job descriptions on what the unit manager is "responsible for" would be controlling. Such a limited review is contrary to the "economic reality" test for exemptions under the FLSA.

Although some courts have found exempt status where the time percentages of employees' non-managerial duties were as high as 90 percent, the Court concludes from the facts in this case that the critical function in Treetop's business is cooking, which is assigned to the unit manager on the first shift, and the unit manager is "primarily" trained to perform that job. The fact that the unit manager or the

relief district manager must substitute as the cook on other shifts in the restaurant also emphasizes the primacy of this job function. In their absence, a cook from another shift assumes cooking and managerial duties for the restaurant. These collective facts demonstrate that the primary duty of the unit manager's job is to cook. Accordingly, the Court finds that the first factor under the bona fide executive exemption is not satisfied.

### b. "[C]ustomarily and regularly directs the work of two or more other employees ..."

As to this factor, the numerical requirement is met as each restaurant has 15 to 20 employees to cover the three shifts. Ezell affidavit (Docket Entry No. 175) ¶ 11. However, due to the cooking functions of the position, the unit manager, in all likelihood, is too busy on the first shift to direct any employee's activities. Although the unit manager's work with the second and third shift employees could satisfy this component, many of the unit manager's management duties are actually shared with other employees at the restaurant and with the district manager. Therefore, the "customarily and regularly" requirement is lacking. Accordingly, the Court finds that the second factor under the bona fide executive exemption is not satisfied.

### c. "[H]as authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing ... advancement and promotion or any other change of status ... will be given particular weight"

In his affidavit, Mr. William Ezell, III, states that hiring and firing of employees is a responsibility of the unit manager and that "[n]ew prospective employees are interviewed by the unit manager who will either hire or recommend such employee for hire without consultation with any other superior Treetop personnel"; that "[u]nit managers have the responsibility of terminating employees who violate company policies"; but that "Treetop does have a policy which restricts unit managers from rehiring former employee[s] of the company without checking with a higher management official or supervisor." Ezell affidavit (Docket Entry No. 175) ¶¶ 24j and 25. Mr. Bean, as a unit manager, and Mr. Nicholson, as a district manager, testified in their depositions that hiring and firing are among the duties of unit managers, but that Treetop utilizes an "It Takes Two" policy, where both the unit manager and either a district or divisional manager sign off on any decision concerning hiring or firing of employees. Plaintiffs' notice (Docket Entry No. 173), Bean deposition at 37, 101–102; Nicholson deposition at 57–58. There are no statistics to show how many employees recommended for hiring or firing by the unit manager are actually adopted by the district manager. It is significant to note, however, that, as previously mentioned, the district managers actively recruit and document their recruitment efforts on their recruiting tracking charts. Even though unit managers share in the responsibility of firing employees with district managers, a district manager has refused to allow a unit manager to terminate an hourly employee and has reversed the unit manager's termination of an hourly employee by allowing the terminated hourly employee to return to the restaurant.

With regard to dealing with discrimination or sexual harassment complaints, Mr. Nicholson stated in his deposition that when he was a unit manager, he reported such complaints to the district manager, who handled the complaints directly and never reported back to him. Plaintiffs' notice (Docket Entry No. 173), Nicholson deposition at 88–89. A memorandum faxed from Gene Ingram's office concerning a district manager's responsibilities indicates that district managers are responsible for sales, profits and employees, as well as everything done in the restaurants

in their district. Plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 99.

These collective facts undermine the role of the unit managers as primarily responsible for hiring, firing and disciplining Treetop's employees. The Court concludes that the proof shows that the unit manager actually shares the authority to hire, fire or discipline with the district and/or division manager and, therefore, the third factor is not satisfied.

### d. "Who customarily and regularly exercises discretionary powers"

As to the discretionary functions beyond those previously discussed, the remaining areas appear to be staffing, ordering food, and the extent to which the unit manager customarily directs the workers at his restaurant. In his deposition, Mr. Bean, who has worked as a manager at all three levels, states that even "simple decisions" concerning the restaurants are made by the district manager, not the unit manager. Plaintiffs' notice (Docket Entry No. 173), Bean deposition at 36.

The defendants admit that hourly employees are scheduled to work as cooks and grill operators during the second and third shifts and that unit managers and district relief managers are scheduled to cook on the first shift, as well as fill in for cooks who do not show up for the second and third shifts. Hourly employees who officially hold the position of cook and grill operator on the second and third shifts are also scheduled as substitutes on the first shift to perform the cooking duties, should the unit manager need their assistance. Defendants' answer (filed November 17, 1998; Docket Entry No. 132) to amended complaint, ¶ 22; Ezell affidavit (Docket Entry No. 175) ¶ 24(d). Ms. Riddle states in her affidavit that as unit manager, she served as cook and worked six days straight followed by two days off. On her days off, the district relief manager performed her duties. Defendants' motion (Docket Entry No. 174) for summary judgment, Exhibit G, Riddle affidavit, ¶¶ 9 and

10; plaintiffs' notice (Docket Entry No. 172), Deposition Exhibits 34, 90, 91, and 92. Accordingly, company policy sets the significant scheduling and staffing arrangements for all practical purposes.

As noted earlier, the unit manager, whose back is to the employees and the dining area, works mainly as a cook during the first shift and therefore has little time or opportunity to perform any supervisory functions or have any discretionary authority. The unit manager's job is to cook, and he or she is tied to the grill during the busiest shift of the restaurant. Even with regard to the unit manager's discretionary authority during other shifts, it is essentially the district manager who controls what goes on in the restaurants in a particular district.

A memorandum from a representative of Treetop to all district managers dated March 23, 1998, instructs district and division managers to "physically direct traffic during the shift change" in the restaurant and to take note of employees on first shift who "lay out or are late . . ." and to put them on a shift "where they can be on time and make it to work." Plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 107.

As to this factor, the plaintiffs contend that given their duties and activities at the restaurants, district managers are, in fact, directing employees. The district manager periodically schedules "in-unit meetings" at the restaurants in his or her district to discuss with the hourly employees what needs to be done in the restaurants. The unit managers do not schedule such meetings. In fact, sometimes the district manager meets with the employees in the restaurant without the presence and participation of the unit manager, who is on the grill cooking. Plaintiffs' notice (Docket Entry No. 173), Bean deposition at 26, 52–53; Harper deposition at 92–94.

In addition, each restaurant has a "unit trainer" or "waitress trainer" who is an hourly waitress/server who is responsible

for training all of the new waitresses, which constitute the vast majority of newly hired employees. *Id.*, Berner deposition at 53; Barbour deposition at 32–35.

The district manager sets the "par level" for ordering food products which establishes the amount of food that is to be ordered in each restaurant in his or her district, anticipating any special events that may occur which would require a deviation from the amount of food normally ordered. Plaintiffs' notice (Docket Entry No. 173), Bean deposition at 49–52; Riddle deposition at 132–133, 155. When products such as eggs, milk and produce are delivered, usually a waitress checks in the products, signs the invoices for the products, and pays the vendors who bring the products, and many times the unit manager does not even know that the products have been delivered. *Id.*, Riddle deposition at 116–119; Morton deposition at 183.

In Treetop's restaurants, an *hourly* cook/grill operator is given a special designation as "shift manager" and is allowed to oversee the staff change between second and third shift on certain nights of the week. *Id.*, Barbour deposition at 19–20, 22; Morton deposition at 175; Nicholson deposition at 128–129. The hourly shift manager is allowed to count down the cash registers, is given a key to the commissary and is allowed to pull out stock from the commissary, all of which are the duties of the unit manager and district relief manager when they are on duty. *Id.*, Bean deposition at 211–212; Harper deposition at 144–145.

Treetop's own written memoranda indicate that if a maintenance problem arises in a particular restaurant, the division manager is the one responsible for calling Treetop's maintenance department to coordinate the needed repairs, and the unit manager is not allowed to contact the maintenance department directly. Plain-

tiffs' notice (Docket Entry No. 172), Deposition Exhibits 101 and 77.

As for managerial duties, the unit manager receives telephone calls at home for matters, such as no-shows for work, thefts and consumer complaints, Ezell affidavit (Docket Entry No. 175) ¶ 24(i); shares in profits, subject to deductions,[17] and shares in employment decisions with the district and/or division manager. Defendants' motion (Docket Entry No. 174), Exhibit G, Riddle affidavit, ¶¶ 50–53. Yet, under these facts and Treetop's documents, it is the district manager who regularly exercises discretion, particularly given the undisputed facts that at Treetop's restaurants, unit managers expend only 6 to 17 percent of their time on management matters. Accordingly, this element has not been satisfied, as well.

### e. "[A]n employee who is in sole charge of an independent establishment ..."

As the defendants note, the *Waffle House* court held as follows:

The court finds ... that unit managers spend in excess of 40% of their time, however, in activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of part 541.1 of the regulations, and, therefore, to the extent that they are not paid $250 a week, they would be entitled to overtime and records should be kept, unless the unit managers were entitled to the "sole charge" exception to the 40% limitation contained in the activities test.

*Waffle House*, 1983 WL 2108 *9. Therefore the question remaining under the "primary duty" issue is whether a unit manager is in "sole" charge of the restaurant.

For an employee who does not expend 40 percent of his or her time on management matters, as outlined above, another factor to be considered is whether this

---

**17.** These deductions may result in a loss of the unit managers' exempt status, *Auer v. Robbins*, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), but this issue was not briefed by the parties.

employee may nonetheless be exempt by virtue of the fact that the employee is also the sole person in charge of an independent establishment. 29 C.F.R. § 541.1(e). Other regulations define this "sole person in charge factor":

> (e) In order to qualify for the exception the employee must ordinarily be in charge of *all* of the company activities at the location where he is employed. If he is in charge of only a portion of the company's activities at his location, then he cannot be said to be in sole charge of an independent establishment or a physically separated branch establishment
> . . . .

29 C.F.R. § 541.113(e) (emphasis added). According to the Wage and Hour Division's *Field Operations Handbook,* such employees must receive substantially higher wages:

> [M]anagement personnel in small retail or service establishments who are in charge of the establishment during their tour of duty and are paid substantially higher wages than their subordinates will typically meet the primary duty test.

Defendants' motion (Docket Entry No. 174) for summary judgment, Exhibit J, *Field Operations Handbook* at 13.

Without restating again the full scope of the district manager's duties at the restaurant,[18] and based upon the testimony of former division managers, district managers and unit managers, the Court concludes that the unit manager is not actually in charge of "all" of the on-site activities of the restaurant he or she manages. Therefore, the unit managers are not in "sole charge" of the restaurant they manage. Accordingly, the "sole charge" element has not been satisfied.

---

**18.** Even if the Court were to adopt Treetop's argument on this factor, the determination is not conclusive of the issue. The law in this Circuit is that the employer must show "plain and unmistakable evidence" for "each employee" that its operations satisfies all of the

#### f. *"Who is compensated for his services on a salary basis at a rate of not less than $155 per week "*

As established under (a)-(e), the Court has concluded that unit managers are not shown to have management as their primary duty. The Court has also concluded that the rate of the salary unit managers make is based on a rate of $212.50 per week, which is subject to additions and deductions for losses. Based upon the hours they have expended, there is proof that at least some unit managers have been paid just above minimum wage. Contrary to the sole employee factor, these unit managers effectively have not been paid substantially higher salaries.

The Court has found that the "primary duty" of unit managers is not managerial, but rather to be cooks/grill operators on the first shift and that managerial duties are shared with other employees and mainly district managers, and all are supervised closely by district managers. Therefore, the question of whether or not the rate of their weekly salary is not less than $155.00 or not greater than $249.00 is irrelevant at this point. The parties agree that the main determination is whether the primary duty of the plaintiffs as unit managers is managerial.

Accordingly, the plaintiffs' motion for summary judgment should be granted as to those employees for which the long test applies.

#### 2. *The short test*

*"An employee who is compensated on a salary basis at a rate of not less than $250 per week ..., and whose primary duty consist of the management of the enterprise in which the employee is employed ... and includes the customary and regular direction of*

factors in § 541.1(e), *see Pezzillo,* 414 F.Supp. at 1268 (quoting *Hodgson v. The Klages Coal & Ice Co.,* 435 F.2d 377, 382 (6th Cir.1970)). Even if Treetop were correct on § 541.1(e), it failed to meet its burden regarding the other factors under § 541.1(a)-(d).

*the work of two or more other employees therein, ...."*

Under the short test for an employee to be a *bona fide* executive capacity, the employee must be paid on a "salary basis." 29 C.F.R. § 541.1(f). For salary basis compensation, the FLSA regulation provides:

> (a) An employee will be considered to be paid "on a salary . basis" within the meaning of the regulations if under his employment agreement he *regularly receives each pay period on a weekly,* or less frequent, basis *a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.* Subject to the exceptions provided below, the employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked....

29 C.F.R. § 541.118(a) (emphasis added).

The defendants allege that "[a]ll district relief managers and approximately fifty percent of all unit managers were paid $250.00/week or more in salary during the entire three year time period prior to the filing of the instant lawsuit." Defendants' memorandum (Docket Entry No. 176) in support of motion for summary judgment at 14 (citation omitted). The plaintiffs allege that "when the actual amount of their pay that they received each week is divided by the number of hours they actually worked, they made barely over minimum wage and less per hour than the hourly cooks/grill operators in the restaurants, who make between $7.00 and $9.00 per hour." Plaintiffs' memorandum in response (Docket Entry No. 183) at 10 (citation omitted).

The parties have agreed that the district relief managers are paid at a rate based on $250.00 per week, but that the unit managers are paid at a rate based on $850.00 per 4 week period or $212.50 per week. These rates are also subject to change based on bonuses for the district relief managers and bonuses, as well as deductions for losses, for the unit managers.

Even if any of the unit and/or relief district managers make at least $250.00 a week, the Court has already determined that their primary duty is not managerial. The Court has found that the primary duty of the unit and district relief managers is being a cook on the first shift and substitute cook on the other shifts. Accordingly, the defendants fail to satisfy the short test for these employees.

## IV.

 In their motion for partial summary judgment, the plaintiffs contend that the defendant, James Shaub, is liable with Treetop and Mr. Ezell as their employer under the FLSA. The plaintiffs allege that Mr. Shaub has been the president and chief operating officer at Treetop since November of 1996, and a shareholder since 1993. They further allege that he has control over the day-to-day operations of the company and the authority to make any changes necessary to correct any problems.

As to whether Mr. Shaub is an employer under the FLSA, under 29 U.S.C. § 203(d), the FLSA defines an "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." In *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 965 (6th Cir.1991), this Circuit utilized the "economic reality" test on whether a party is an employer: "a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Id.* (quoting *Donovan v. Agnew,* 712 F.2d 1509, 1511 (1st Cir.1983)); *see also, Fegley v. Higgins,* 19 F.3d 1126, 1131 (6th Cir. 1994), *cert. denied,* 513 U.S. 875, 115 S.Ct. 203, 130 L.Ed.2d 134 (1994).

Unlike the corporate president in *Dole,* who was a co-owner, Mr. Shaub is a minor-

ity stockholder who owns no more than 2 percent of Treetop's stock. Defendants' motion (Docket Entry No. 174), Shaub deposition at 27–30. Under *Dole,* the individual officer must have "a significant ownership interest in the corporation, *and* [ ] control over significant aspects of the corporation's day-to-day functions, including determining employee salaries." *Dole,* 942 F.2d at 965.

Even if the Court accepts the plaintiffs' contention that Mr. Shaub has a leadership role in the day-to-day operation of Treetop, Mr. Shaub lacks the "significant ownership interest" in Treetop to be liable for the alleged FLSA violations. Therefore, Mr. Shaub shall be dismissed as a defendant in this action.

## V.

The defendants allege a good faith defense under 29 U.S.C. § 260. They first state that under the Portal–to–Portal Act, 29 U.S.C. § 255, "any action under FLSA for unpaid overtime compensation must 'be commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.' " Defendants' memorandum (Docket Entry No. 176) at 22. The defendants further allege that even if the Court finds they violated FLSA, such violation was not willful and the statute of limitations is two years. *Id.* Lastly, the defendants state that the good faith defense under 29 U.S.C. § 260 removes liability for liquidated damages. The defendants contend that should the Court "find that Defendant[s] [have] misinterpreted the requirements of the FLSA, it should find that the mistake was reasonable considering the *Donovan v. Waffle House* decision," barring the plaintiffs from liquidated damages. *Id.*

The plaintiffs allege that "the fact that Treetop was aware that its corporate franchisor had narrowly escaped liability on this same issue in 1983 makes Defendants' conduct in stepping over any boundaries set up by the *Waffle House* court all the more willful and in bad faith." Plaintiffs' memorandum (Docket Entry No. 183) at 24. The plaintiffs allege that since the 1983 action the defendants have developed a system that goes beyond the conduct approved on the issues of sole charge and primary duty. They further allege that liquidated damages are mandatory unless the defendants carry the substantial burden of proving they acted in good faith. *Id.*

As to the defendants' good faith defense under 29 U.S.C. § 260 to bar plaintiffs' claims for liquidated damages, the Court agrees that an award of liquidated damages is inappropriate. In light of the district court's decision in *Waffle House,* as well as other court decisions involving similar employees in similar settings, as previously enumerated, the Court concludes that any recovery by the plaintiffs must be limited to the two-year period immediately preceding their filing of this action.

## VI.

The Court concludes that the plaintiffs' motion for partial summary judgment as to the liability of Treetop and Mr. William Ezell for FLSA violations should be granted, but denied as to Mr. Shaub's liability as an employer under the FLSA. The defendants' motion for summary judgment should be denied, except as to Mr. Shaub, who is not liable for these violations, and as to their good faith defense barring liquidated damages and limiting recovery to the two-year period before filing suit. The Court concludes that oral argument is unnecessary and Treetop's motion shall be denied. The plaintiffs' motion to strike shall be granted. The defendants' motion to supplement its statement of undisputed facts shall be granted.